Victoria **GREENBAUM**, Plaintiff,

v.

Svenska **HANDELSBANKEN, NY,** Defendant.

**No. 95 Civ. 3850 (SS).**

United States District Court, S.D. New York.

Sept. 8, 1999.

Cooper, Sapir & Cohen, Melville, New York, Robert E. Sapir, of counsel, Sapir & Frumkin LLP, of counsel, White Plains, NY, Donald L. Sapir, Robert T. Mc-Govern, Steven R. Shapiro, of counsel, for plaintiff.

Chadbourne & Parke LLP, New York City, Peter N. Hillman, Debra M. Patalkis, Mitchell P. Hurley, of counsel, for defendant.

## OPINION AND ORDER

SOTOMAYOR, Chief Judge.[1]

Defendant Svenska Handelsbanken, N.Y. ("SNY") moves under Rule 50(b) of the Federal Rules of Civil Procedure for judgment as a matter of law vacating a jury verdict in favor of plaintiff Victoria

1. Sitting by designation.

Greenbaum on her claims of sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the equivalent provisions of the New York State Human Rights Law and the New York City Administrative Code. In the alternative, SNY moves to reduce the jury's compensatory damage award of $320,000 by $181,303 because the jury awarded damages for activities that allegedly occurred outside the relevant statute of limitations. SNY also moves to vacate the $1.25 million punitive damage award granted by the jury as unsupported by the evidence or, alternatively, to remit a substantial portion of the award as excessive. Finally, SNY moves to vacate the entire jury verdict on the ground that Greenbaum's counsel allegedly committed various prejudicial errors during the trial. For the reasons to be discussed, the Court denies all of SNY's motions.

## BACKGROUND

All of the events relevant to this case occurred in the period beginning in late 1987, when SNY first hired Greenbaum, and ending in April 1995, when SNY terminated her employment. The following facts are either undisputed or could have been found by a reasonable jury.

### A. SNY's Corporate Culture and the Vice Presidential Position

Defendant SNY is the New York branch of Svenska Handelsbanken, AB ("SHB"), an international banking corporation headquartered in Stockholm, Sweden. SHB has had more than 500 employees during all the times relevant to this action. In May 1987, SNY opened up as a startup branch with approximately fifteen employees, and by the end of 1994, the branch had approximately eighty employees.

SNY was divided into departments, each of which was managed by a department head with the title of either vice president

or senior vice president. Each department head managed a team of employees, some of whom supervised others in the department and some of whom also held the title of vice president. The branch as a whole was managed by a general manager ("GM"), who had a deputy general manager working under him. Together, the GM, the deputy GM and the department heads made up the management committee (the "GM committee"), which had the authority to make many of the major decisions for the branch, including all decisions concerning employees' salary increases, bonuses and promotions. Throughout the period in question, all of the members of this committee were men, and the only person who was a member of the committee for the entire period was Harry Roberts, the deputy GM.

In its corporate brochure, SHB described itself as a highly decentralized organization, consisting of a network of local branches, which had nearly complete autonomy to govern their internal affairs and client relations. The brochure stated that "[a] decentralized organisation [sic] . . . requires a strong corporate culture" and a "clear set of instructions." JT 41 at VG678.[2] Part of SHB's "strong corporate culture" was the ambition to "grow its own leaders," and "[a]s far as possible, promotion [was] done internally." *Id.* at VG682. Furthermore, according to SHB's brochure:

> Our aim is to hire the best people and to keep them in the bank until they retire. Exceptions to this rule are usually signs of a failure. . . . We might have hired somebody who proved to be a disappointment. Or we might have failed to offer a good person a sufficiently challenging job.

*Id.*

From the beginning of 1987 and ending in 1994, Greenbaum consistently sought but was consistently denied the position of vice president. Throughout this time, SNY had a number of vice presidents, and Bengt Ragna, one of SNY's key witnesses and its GM from 1991 to 1994, testified that there were no formal quotas on this number. *See* Tr. at 1235.[3] In principle, employees could be promoted to vice president without any substantial changes in duties or responsibilities, and these promotions were thus largely changes in title and status. *See id.* at 1276. To obtain the title, an employee ordinarily needed a "strong recommendation from a senior person, [the candidate's] superior." *Id.* at 1217. Ragna articulated six criteria that he used to assess candidates. These criteria, which "were not written in stone" but instead derived from the "culture of the bank" and the "heritage that [he] ha[d] learned] as a general manager coming from the Swedish part of the bank," *id.* at 1203, included: (1) whether the bank would be comfortable having the individual represent the bank; (2) a strong performance record; (3) a good management record; (4) whether the person can be a good role model; (5) the importance of the job to SNY; and (6) dedication to the job. *See id.* at 1205–09.[4] In practice, however, supervisors' recommendations were given

---

**2.** "JT" refers to the Joint Trial Exhibits. The parties stipulated to the admissibility of these exhibits at trial. The references following "at" refer to the internal pages or bates numbering systems reflected in the designated exhibit.

**3.** "Tr." refers to the Trial Transcript and the numbers to the designated pages of the transcript. Many witnesses testified to the same evidentiary propositions, and this opinion cites only to illustrative portions of the record.

**4.** SNY identified five criteria in its response to Greenbaum's interrogatory requests: (1) supervisory and management responsibilities; (2) past performance; (3) interpersonal skills; (4) technical skills; and (5) integrity. *See* Tr. at 1214–16. These criteria were endorsed at trial as the operative criteria by another former GM who had supervised Greenbaum. *See id.*

strong deference and were rarely rejected. *See id.* at 1044–46, 1123–25.

### B. *Greenbaum's Employment and Her Attempts to Obtain the Title of Vice President*

#### 1. The Initial Interview and Employment

In September 1987, John Pyron, senior vice president and head of SNY's treasury department, *see id.* at 89–90, and John Amoroso, vice president in charge of the money market and corporate desks, *see id.* at 88, interviewed plaintiff Greenbaum for a senior money market trader position in the treasury department, *see id.* at 91–92, which was one of the branch's main profit centers, *see id.* at 1202. During the interview, Pyron and Amoroso discussed job responsibilities, benefits, title and salary, and Greenbaum, who was then employed as an assistant vice president at another company, expressed interest in joining the bank with the title of vice president. *See id.* at 92–93. Pyron explained that although SNY was hiring for a vice-presidential level job, he would be unable to offer her that title from the start. *See id.* at 93. He indicated, however, that if she were to accept an offer of employment with SNY, she would be given the title after her first annual review in December. *See id.* Shortly after the interview, Pyron and Amoroso discussed Greenbaum's candidacy, agreed that she was qualified for the position, and Pyron offered her a position as assistant vice president. *See id.* at 94–95. Greenbaum accepted and began work under Amoroso on September 28, 1987. *See* PX 1.[5]

#### 2. The Early Attempts to Obtain Vice President Status as a Trader

Three months later, in December 1987, the GM committee, which included Pyron, discussed Greenbaum's promotion to vice president but decided that it would defer its decision until March 1988, when she could be reviewed on the basis of six months' performance. *See* Tr. at 98–99. Amoroso was nevertheless asked to fill out a preliminary review for her. Greenbaum had already made money for SNY at the time, and Amoroso's review stated that:

> Vicky in her short time with Svenska has contributed her expertise and excellent analytical skills in organizing and maximizing the potential of the deposit book. Vicky also has been instrumental in managing the short-date trading, both in training and in actual trading strategies. To be reviewed March 1988.

PX 1; *see also* Tr. at 101. Pyron concurred in this review and explained to Greenbaum that her promotion would not occur until March. *See* Tr. at 102.

In March 1988, Amoroso filled out a more extensive review of Greenbaum's performance to date, which stated that "Vicki has proven that she can properly head the money market and corporate desks when her supervisor [*i.e.*, Amoroso] is not in." PX 2 at SNY000063A. The evaluation also recommended her for a promotion to vice president:

> Vicki has demonstrated an excellent knowledge of sophisticated markets, an expertise in trading them and the managerial style to motivate the desk. She also readily offers her technical skills to the other traders assisting in their positions. In light of the above it is recommended that Vicky be promoted to Vice President.

*Id.* Pyron agreed with this recommendation, *see* Tr. at 110–11, and presented the evaluation to the GM committee. The committee decided not to promote Greenbaum, however, and Pyron explained to her that the committee felt that a promotion was inappropriate at that time because Greenbaum did not have any staff reporting directly to her. *See id.* at 111.

Following the March review, Amoroso and Pyron decided to give Greenbaum more responsibilities and make her a full-

---

5. "PX" refers to Plaintiff's Trial Exhibits.

time rather than a part-time arbitrage trader. *See id.* at 113–14. In doing so, they hoped in part to "give her a higher profile in the bank" so that she could "show her contributions more clearly to management." *Id.* at 114. Greenbaum was also given a staff that reported directly to her. *See id.* at 112. At the end of the year, Amoroso once again filled out a written evaluation for Greenbaum, which gave her an overall rating of five out of six: "Results consistently exceed job requirements." PX 3 at SNY000061. The evaluation also stated that "Vicki is the senior person on the desk when the chief trader is out and she has proven her ability to properly run the desk." *Id.* at SNY000060. The evaluation further noted that "[t]he bank could make better use of Vicki's talents by having her manage the entire deposit book from overnight to one year" *Id.* at SNY000061. Although Pyron also endorsed this evaluation, the GM committee once again denied Greenbaum a promotion. *See* Tr. at 116–17.

During the next year, 1989, Greenbaum expanded her trading activity at SNY and continued to express interest to her supervisor in becoming a vice president. At the end of the year, she was given the highest overall evaluation possible: "Results consistently far exceed job requirements." PX 4 at SNY000067a. The written comments included the following statements:

i. Vicki has taken a small, misguided short date desk and efficiently turned it into a profitable, high volume operation through the thorough training and close monitering of her staff.

ii. Vicki was instrumental in insuring [sic] that the BA program has been a success in spite of the enormous increase in volume, keeping accurate records, properly managing lines, limiting compensation problems. She has also successfully managed the short-date desk to operate efficiently and profitably.

iii. Vicki's responsibility in managing the deposit book is of prime importance to the bank and she has successfully achieved profit targets in a difficult market. She has proven to be an excellent manager in training her staff and making the short date operation profitable.

iv. Through Vicki's market expertise and the respect she receives from the other traders, Vicki is able to manage the desk while I am out. In light of the above, *I recommend Vicki be promoted to Vice President.*

PX 4 (emphasis added). Pyron agreed with this recommendation and again took it to the GM committee, which again decided not to promote Greenbaum. *See* Tr. at 119–121. Pyron explained that the committee had decided a promotion was inappropriate at that time because vice presidents could not report to other vice presidents at SNY, and because Amoroso, her direct supervisor, was a vice president. *See id.* at 121. Amoroso testified at trial that this explanation did not make sense in the context of SNY's corporate culture, *see id.*, and that there had been several examples of vice presidents reporting to other vice presidents at the bank. *See id.* at 121–22; *see also id.* at 499, 1276.

In the next year, 1990, Greenbaum continued trading in the treasury department, where she supervised at least three persons, Freddie Koveath, Russ Pidgeon and Chuck Munziata. *Id.* at 620. Amoroso testified that Greenbaum was "directly responsible for a large part of [the bank's] profits in [1990]." *See id.* at 184. At the end of the year, Greenbaum thus received the highest possible overall evaluation once again. The evaluation stated, among other things that:

i. Vicki has been very successful in *substantially increasing the bank's profitability* in 1990 by good trading positions, active management of the short-term gap and also emphasis on

the profitable (and relatively risk-less) over-night positions.

ii. She is directly responsible for a large part of the Treasury's profits this year. As the bank has grown, so have Vicki's responsibilities and she has successfully managed the increased demands of a larger bal-ance sheet. In light of the above, *I recommend Vicki be promoted to Vice President.*

PX 5 (emphasis added). Pyron agreed with Amoroso's evaluation once again and took it to the GM committee, which once again decided not to promote Greenbaum. *See* Tr. at 187–88. Pyron told Greenbaum that she was not given the title this time because the GM committee felt her "desk wasn't big enough, that [she] didn't have a vice-presidential job." *Id.* at 62

### 3. Move to the Systems Department

In 1991, Greenbaum was taken off the money market desk and transferred to the position of assistant deputy treasurer un-der Stefan Tunguz, who was deputy trea-surer at the time. *See id.* at 623–24. Greenbaum expressed an interest in con-tinuing to trade for the bank and asked Pyron and Tunguz whether the new job would be merely administrative. Tunguz told her that although her new position was in the systems department and was partly administrative, she could continue to do some trading under him, and that someone with her experience was needed to get the systems department off the ground. *See id.* at 625–26. He also indi-cated that if she did a good job, she would still make vice president at the end of the year. *See id.* at 626. When December came, Tunguz gave Greenbaum an average evaluation, which stated that she "met all standards" at her new position. PX 6.

During 1991 and for some time thereaf-ter, Tunguz, together with two other male members of his department, Dominick Carollo, a vice-president, and Chris Pa-tronis, a trader, were reported frequenting strip and topless clubs and recounting their visits in graphic detail in the office. Greenbaum and other women in the de-partment repeatedly complained about this activity. *See, e.g.,* Tr. at 236–39, 688–91. Carollo also reported to Greenbaum that another woman trader, who had been in-terviewed by Tunguz and Carollo, was not to be hired in the department because "[y]ou know how they feel about women in the bank." *Id.* at 693–94.

After Tunguz's evaluation of Green-baum, the GM committee gave many of the other employees at SNY nearly 100% bo-nuses but gave Greenbaum a bonus of only $3,000. Greenbaum received no raise and no promotion to vice president. *Id.* at 627.

At this point, Greenbaum met with Rag-na, who was the GM at the time, and asked him directly for an explanation as to why she was treated in this way. Ragna told her that the decision was not really his and that she should talk to Pyron and Tunguz. *See id.* at 632–33. Pyron, however, indi-cated that Ragna had the final say over these matters, and "that I [Greenbaum] [was] lucky even to get a $3,000 bonus" given that Ragna "had his own numbers" and initially wanted to give her no bonus at all. *Id.* at 634. In addition, although Greenbaum had been expecting to return to the trading desk shortly after this time, Pyron indicated that this probably would not happen at SNY and confided that he "th[ought] [she] should get [her] resume together." *Id.*

In 1992, Greenbaum continued her sys-tems and administrative duties under Tun-guz. *See id.* She repeatedly told Tunguz that she would like to return to trading and become a vice president. *See id.* at 649. On October 6, 1992, Tunguz asked her to get involved in some of the bank's swap trading by helping to supervise Meg Uyeno, who was then in control of the branch's swap portfolio. *See id.* at 636–37. Carollo, who was present during Tunguz's conversation with Greenbaum about the new assignment, expressed concern about two women working together. *See id.* at 639. At the end of the year, Tunguz re-

viewed her overall performance as "excellent," but again Greenbaum received no promotion. PX 7.[6]

#### 4. Restoration to the Trading Desk

In 1993, Greenbaum was finally restored to the trading desk. *See* Tr. at 210. Greenbaum was very successful during this year, earning almost $2 million in profits for the bank. *Id.* at 211. Tunguz and Amoroso reviewed her very highly, calling her performance "remarkable," PX 8, and both agreed to recommend her for the title of vice president, *see* Tr. at 216–17. Tunguz even went so far as to tell Greenbaum, "I don't see how they can say no to [your promotion] this year, Vicky, with profits like this." *Id.* at 649. Nevertheless, Greenbaum was not promoted. *Id.* at 217–18. This time, no reason was given and Ragna, the GM at the time, apparently simply rejected the idea and brushed off Tunguz's attempt to obtain an explanation with a dismissive hand gesture. *Id.* at 653–54.

#### C. *The Complaint and SNY's Subsequent Employment Actions*

On January 6, 1994, shortly after learning that SNY was not going to promote her once again, Greenbaum filed a complaint with the New York State Division of Human Rights ("NYSDHR") charging SNY with employment practices that discriminated against her on the basis of her age and sex, both in violation of the New York State Human Rights Laws. *See* PX 65. The NYSDHR scheduled a conference with the parties to review the matter on April 19, 1994. *See* Tr. at 658. This conference, which was later rescheduled for May 9, 1994, was held at the NYSDHR's offices at 125th Street in the Harlem section of Manhattan, with SNY officials present, including Ragna, Roberts and Kraig Klosson, senior vice president in charge of administration and systems. *See id.* at

659. SNY was accompanied by counsel at this meeting, and at trial. Ragna explained that SNY had contacted counsel to ensure that SNY complied with all of its legal obligations. *See id.* at 1156. Following Greenbaum's complaint, Ragna also undertook to explain to various SNY officials both the seriousness of the retaliation laws and how the laws protected Greenbaum. *See, e.g., id.* at 987–89. SNY's policy handbook contained a section on equal employment opportunities, which explicitly prohibited "all forms of retaliation." *Id.* at 980.

Shortly after the conference, Tunguz left SNY, and Amoroso was promoted to Tunguz's position of treasurer, thereby leaving open the position of deputy treasurer. *See id.* at 218–19. In May 1994, Ragna, the then GM, and Roberts, the deputy GM, called Amoroso in to a meeting and informed him that they had decided to make the position of deputy treasurer available. *See id.* at 219–20. They also described the qualifications they were seeking. *See id.* at 220. Because Greenbaum had already been performing many of Amoroso's prior duties when he was away, *see id.* at 748, and because he felt she was well qualified, Amoroso recommended Greenbaum, *see id.* at 220. Ragna and Roberts reacted "very negative[ly]" to this suggestion:

> Mr. Ragna said no immediately and Mr. Roberts started yelling and saying, do you know what she has done to us ... she has filed a complaint against the bank and she took us up to Harlem for some meeting and inconvenienced us and is trying to hurt the bank so how can you suggest someone like her.

*Id.* at 220–21. When Amoroso asked what Roberts's comment meant, Roberts "said that she had filed some complaint against the bank ... [and that] both he and Mr. Ragna were very upset about it, so they said absolutely not Mrs. Greenbaum, we

---

6. This evaluation says that it covers 1991. There is, however, evidence in the record from which a reasonable jury could have con-

cluded that the document was in fact Greenbaum's evaluation for 1992 and that the listed date was erroneous.

wanted someone new or outside the bank." *Id.* at 221.

Amoroso was then instructed to talk to Joyce George, who was in charge of personnel, to draw up an official job posting for deputy treasurer. *See id.* at 222. During their conversation, George told Amoroso that "she admired [him] for recommending Mrs. Greenbaum and that . . . it was admirable of [him] to suggest it because . . . she knew that [Amoroso] knew it would hurt [him] eventually." *Id.* at 223. Several other bank officials also discussed Greenbaum's complaint with Amoroso and one official told Amoroso that he should not push Greenbaum for the deputy treasurer position. *See id.* at 224–230. That official explained that such an action would be "looked on very badly by Stockholm," because "it was unheard of in Sweden" to "file a complaint against your employer." *Id.* at 226.

Although Amoroso testified that SNY officials *never* asked him to treat Greenbaum any differently in the ensuing period, *see id.* at 285, they asked him to watch her very closely and repeatedly inquired about her performance and attitude, *see, e.g., id.* at 225, 228–30, 285. Amoroso repeatedly responded that she was working well and hard, *id.* at 226, 228, and told them that she "made money even in 1994," *id.* at 229. In January 1994, Greenbaum made approximately $128,000 for the bank. *See* PX 80a. From December 1993 through the end of February 1994, she made approximately $658,540 for the bank. *See* PX 80b. There is no evidence suggesting that Greenbaum stopped making profits for SNY at any point while she worked at the bank as a trader.

In or around October 1994, SNY underwent a reorganization, and the branch was divided into an "HMT" (treasury) and an "HMX" (fixed income) division. The former dealt primarily with investments with maturities of one year or less, and the latter dealt primarily with interest rate securities with maturities of greater than one year. *See id.* at 664, 666, 990; *see also*

JT 1. Although Greenbaum had experience with both types of investments, *see* Tr. at 667, and although there was a vacancy in the money market desk in the HMT division, *see* PX 76 at 000824, SNY placed Greenbaum in the HMX division, *see* JT 1. That division was managed by the central treasury in Stockholm, *see* JT 13, and Greenbaum reported directly to Stephen Downes, who was the new head of the New York HMX desk, *see* Tr. at 989. By placing Greenbaum with the HMX division, SNY effectively separated her from the great bulk of its traders: excluding division heads, seventeen employees were placed in the HMT division and only three—Victoria Greenbaum, Meg Uyeno and Russ Pidgeon—were placed in the HMX. Uyeno was on maternity leave at the time. Like Greenbaum, she had a complaint pending with the NYSDHR, alleging sex and age discrimination against SNY. *See* Tr. at 990.

On February 24, 1995, the NYSDHR determined that it had jurisdiction over Greenbaum's complaint and issued a finding of probable cause that SNY had engaged in or was engaging in unlawful discriminatory practices against Greenbaum. *See* PX 65. Four months after being placed in the HMX desk and less than two months after the NYSDHR's determination of probable cause, Greenbaum received a letter from Downes, dated April 10, 1995, which informed her that she was being terminated as part of a general phase-out of New York's HMX division. The letter stated:

> The Handlesbanken Markets division HMX has decided, after due consideration and consultation with local management, no longer to operate a trading desk in New York.
>
> Therefore, I am very sorry to inform you that the duties you currently perform for the Bank will no longer be required after April 28th 1995. This action is in no way critical of your personal performance and I wish to thank

you for the hard work and professional ability you have given to the Bank. JT 11.

At trial, Ragna, SNY's GM from 1991 to 1994 and a long-time employee of SHB, testified that if a "person's job was eliminated [at SNY], an effort was made to find a new position for that individual within the bank" and that the bank generally tried to "minimize any difficulty for the individual." Tr. at 1241. He also stated that he could not recall any individuals who were asked to take a reduction in salary upon being assigned a new position under these circumstances. *See id.* at 1242. Greenbaum's termination letter did indicate that a position would be posted in the near future to help manage a portfolio for the central treasury and that Greenbaum would be welcome to apply. After receiving this letter, Greenbaum met with Downes and George to discuss her termination and the possibility of applying for this unposted job. *See* Tr. at 672. Downes described the new position as mainly administrative, *see id.* at 673, and Greenbaum, who was making $107,000 per year at the time, subsequently received a letter from George informing her that the position would be in the salary range of only $60,000 to $75,000 per year, *see id.* at 674–75. Greenbaum decided not to apply for the job, and her tenure with SNY ended on April 28, 1995. *See id.* at 676. Pidgeon, who was the only male in the recently phased-out HMX division and who had been making only $62,500 per year, applied for the position, obtained it and procured a salary increase of $5,000. *See* JT 31 at 003114. Uyeno, who was the other woman in the HMX division and who had also filed a discrimination complaint against SNY, was terminated on April 28, 1995. *See* Tr. at 679.

### D. *The Prior Proceedings*

On May 26, 1995, Greenbaum brought this action against SNY claiming that SNY violated her rights under Title VII of the Civil Rights Act of 1964 and the equivalent provisions of the New York State Human Rights Law and New York City Administrative Code. In particular, Greenbaum alleged that SNY engaged in a continuing violation of her civil rights by consistently refusing to promote her to vice president because of her sex and age in the years 1988 to 1994, and by refusing to increase her salary and benefits in a manner commensurate with this position. Greenbaum also claimed that she had been subjected to a hostile work environment because of her sex during this period. Finally, Greenbaum claimed that SNY retaliated against her by failing to promote her to deputy treasurer in 1994 and by terminating her in 1995, all because she filed an administrative complaint with the NYSDHR and participated in its subsequent investigations.

The Court held a jury trial from April 28 to May 12, 1997. Because the appropriate burden of proof for establishing punitive damages was unclear under state law, the Court charged the jury under both a preponderance-of-the-evidence standard, which was applicable under Title VII, and a clear-and-convincing-evidence standard, which some state courts had suggested was applicable under state law. On May 16, 1997, the jury rendered a verdict finding in favor of Greenbaum on her claims of sex discrimination between 1989 and 1994 (*i.e.,* for six of the seven years alleged) and retaliation, but against her on her claims for sexual harassment and age discrimination. The jury awarded Greenbaum $320,-000 in back pay, refused her any front pay, and decided that punitive damages in the amount of $1,250,000 were warranted by a preponderance of the evidence but not by clear and convincing evidence.

After receiving post-trial motions from the parties, the Court held that the preponderance-of-the-evidence standard was appropriate for assessing punitive damages under New York state law. *See Greenbaum v. Svenska Handelsbanken, N.Y.,* 979 F.Supp. 973 (S.D.N.Y.1997). The Court also held that the jury's back

pay award included prejudgment interest and that reinstatement and front pay were inappropriate remedies under the circumstances. *See id.* Finally, the Court awarded Greenbaum $336,778.88 in attorneys' fees, *see Greenbaum v. Svenska Handelsbanken, N.Y.*, 998 F.Supp. 301 (S.D.N.Y.1998), and decided that the applicable cap on punitive damages awardable under Title VII in this case was $300,000, *see Greenbaum v. Svenska Handlesbanken, N.Y.*, 26 F.Supp.2d 649 (S.D.N.Y.1998). Only SNY's motions for judgment as a matter of law remain. This opinion addresses these motions.

## DISCUSSION

■ The standards for reviewing Rule 50(b) motions are well settled. Courts may grant a motion for judgment as a matter of law only if there is either " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party].' " *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (internal quotes and alterations omitted)). In applying these standards, courts must

> consider the evidence in the light most favorable to the party against whom the motion was made and give that party the benefit of all reasonable inferences ... that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.

*Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir.1988) (internal quotes omitted). Although courts must credit any genuinely uncontradicted evidence in support of a moving party's position, *see Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1314 (2d Cir.1990), they must focus on the evidence, and on the reasonable inferences that can be drawn from this evidence, in support of the jury's findings. *See* 9 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2529, at 573 (1971).

Before addressing SNY's arguments, the Court notes that SNY's briefs reveal a defect that pervades many, if not all, of its arguments. Rather than attending to the proper Rule 50(b) standards, SNY often cites only those isolated portions of the record that support its positions and claims that this evidence is undisputed when the record contains ample evidence to the contrary. SNY also tends to view the evidence in a light most favorable to its own positions and to assert that this evidence supports unique factual conclusions when opposing inferences could also be reasonably drawn.[7] The Court calls attention to these facts only to highlight this potentially recurring problem and to underscore the importance of viewing the record in its proper Rule 50(b) light.

### I. Discrimination in Promotions and Compensation

■ SNY's first argument for judgment as a matter of law alleges that the jury's findings of sex discrimination in this case should be vacated because the record contains insufficient evidence for a jury to have found an adverse employment decision that was motivated in part by Greenbaum's sex. Title VII of the Civil Rights

---

7. SNY sometimes cites testimony from its own witnesses in support of a given conclusion, while ignoring the fact that this testimony was controverted at trial and that a reasonable jury could have chosen to discredit SNY's witnesses. For example, SNY argues that the deputy treasurer's position was never to be filled after Amoroso became treasurer, *see* Defendant's Memorandum of Law in Support of Motion for Judgment as a Matter of Law and for Remittitur ("Def.'s Br.") at 88–91, while minimizing Amoroso's direct testimony to the contrary, *see* Tr. at 220–21.

Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1) (1998). This provision has been read to prohibit discriminatory failures to promote, *see, e.g., Brown v. Coach Stores, Inc.,* 163 F.3d 706, 709–10 (2d Cir. 1998), and the New York State Human Rights Law, N.Y.Exec.Law § 296(1)(a), and New York City's Administrative Code, N.Y.C.Admin.Code § 8–107(1)(a), also bar this kind of discrimination.

SNY challenges the jury's findings that SNY violated all three of these statutes, first, by failing to promote Greenbaum to vice president in the period of 1989 to 1994, and, second, by failing to compensate her in an amount commensurate with what other similarly situated males received. Because the evidentiary burdens for establishing sex discrimination under city and state law are identical to those under Title VII, *see Ferrante v. American Lung Assoc.,* 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997) (state law); *Walsh v. Covenant House,* 244 A.D.2d 214, 664 N.Y.S.2d 282, 283 (1st Dep't 1997) (city law), the Court need only address the evidence under the relevant Title VII analysis.

A. *Fisher and the Standards for Reviewing Evidence of Title VII Violations*

Courts have traditionally analyzed Title VII claims under a three-step burden-shifting test, which the Supreme Court first formulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To prevail on a Title VII claim, a plaintiff must establish, first, a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2)

who was qualified for a position and (3) was denied the position (4) under circumstances giving at least minimal support to an inference of discrimination.[8] *See id.; see also Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 311–12 (2d Cir.1997) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 & n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Establishment of a prima facie case shifts the burden to the employer to produce a legitimate non-discriminatory reason for its adverse employment decision. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At the third stage, the plaintiff then bears the burden of showing "on the basis of all the evidence presented and without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by discrimination." *Stratton v. Dep't for the Aging,* 132 F.3d 869, 879 (2d Cir.1997).

Before the Second Circuit's decision in *Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997) (in banc) (*"Fisher II"*), the law was ambiguous as to how to interpret a defendant's second-stage burden under this framework. If defendants in Title VII cases were viewed as bearing the burden of explaining their actions—*i.e.,* by producing a legitimate and non-discriminatory ground, which actually motivated their adverse employment decision—then it would seem to follow that plaintiffs could establish discrimination at the third stage simply by showing that these proffered reasons were pretextual. This is because the fact-finder would then, in effect, be left with an unrefuted prima facie showing. If, on the other hand, defendants at the second stage were viewed as bearing only the burden of producing *some* legitimate and non-discriminatory explanation for their employment action—*i.e.,* whether or not

---

**8.** A minimal inference of discrimination is warranted when, for example, a one-time vacancy sought by a plaintiff is filled instead by someone who is not a member of the plaintiff's protected class. *See, e.g., Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1995) (in banc).

this explanation was true—then a finding of pretext would not necessarily be sufficient to infer discrimination at the third stage. In *Fisher II*, the Second Circuit adopted this latter view, holding that a finding of pretext will be sufficient to impose Title VII liability only if the circumstances and other evidence in the case suggest that the employer's explanation was not only pretextual but was also a pretext *for discrimination*. *See* 114 F.3d at 1345.

*Fisher II* signaled an important development in this Circuit's Title VII jurisprudence, and one the meaning of which is still being elaborated. Specifically, *Fisher II* left open the question of how much probative value to accord a finding of pretext in determining whether discriminatory intent existed. Because that question bears directly on the resolution of this case, and because some courts have overstated *Fisher II*'s holding on this point, a brief discussion of these issues is appropriate before turning to the evidence in the present case.

*Fisher II* involved a Title VII and Age Discrimination in Employment Act ("ADEA") challenge to Vassar college's decision not to promote Fisher to a tenured position in its biology department after she had completed a three-year contract as an associate professor. The district court found that Vassar's reasons for this decision—*i.e.*, that Fisher failed to meet the recognized and stated requirements for tenure in the biology department—were false, and that Fisher instead was denied tenure on the basis of her age and sex-plus-marital-status. On appeal, a panel of the Second Circuit rejected all of the plaintiff's evidence except for that supporting her prima facie case and the district court's finding of pretext. *See Fisher v. Vassar College*, 70 F.3d 1420 (2d Cir.1995) ("*Fisher I* ") (collectively, "*Fisher* "). The court then reviewed the district court's

findings of discrimination and found them to be clearly erroneous. The full court finally reheard the case in banc on the limited question of whether review for clear error was even appropriate when the plaintiff had established both a prima facie case and pretext. *See Fisher II*, 114 F.3d at 1332. The court answered this question in the affirmative, relying heavily on the general proposition that "[i]ndividual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." *Id.* at 1337.

Although the court thus held that a finding of pretext does not always warrant a verdict in the plaintiff's favor, it did not—as SNY urges—hold that a finding of pretext is generally irrelevant to the ultimate question of discrimination. The court in *Fisher II* was in fact very careful to note that "a finding of pretext will in many circumstances powerfully support a finding of discrimination." *Id.* at 1345; *see also id.* at 1338 ("The sufficiency of [a] finding of pretext to support a finding of discrimination depends on the circumstances of the case."). Unfortunately, the court provided little guidance as to which circumstances might warrant such an inference.[9] The court suggested only that

[g]enerally speaking, the stronger the [independent] evidence that illegal discrimination is present, the greater the likelihood that discrimination is what the employer's false statement seeks to conceal. And, conversely, the weaker the evidence of discrimination, the less reason there is to believe that the employer's false statement concealed discrimination, as opposed to the numerous other reasons for which employers so frequently give false reasons for employment decisions.

9. The statement was also dicta because the Court affirmed the original clear error finding.

*Id.* at 1346–47. Apart from this general guideline, the Court stated that

> [t]o the extent that an actor in defendant's position is *unlikely* to have proffered a false explanation except to conceal a discriminatory motive, then the false explanation will be powerful evidence of discrimination. On the other hand, if the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent.

*Id.* at 1338 (emphasis added).

In order to understand the factual applicability of these general pronouncements, a review of the circumstances leading up to the *Fisher II* decision is necessary. As noted above, the in banc panel in *Fisher II* limited its consideration to the purely legal question of whether review for clear error was even appropriate when the evidence supports a prima facie case and a finding of pretext. The answer to this question did not require applying the clear error test to the specific facts of the case. An examination of the facts underlying the original panel's application of this test can, however, help illuminate the proper breadth of *Fisher II*'s otherwise abstract language.

This examination reveals several unorthodox facts that affected the outcome of the case. As an initial matter *Fisher* involved a tenure decision. Because tenure generally involves the grant of nearly irrevocable rights to pay and continued employment, this sort of promotion is a rather extraordinary and uncommon practice from the employment perspective. *See Zahorik v. Cornell Univ.*, 729 F.2d 85, 92–93 (2d Cir.1984) (discussing unique characteristics of tenure decisions). Even in the context of a college like Vassar, where tenure was the norm for full professors, the record suggested that less than half of the candidates considered at the expiration of their contracts as associate professors normally obtained tenured positions. *See generally Fisher I*, 70 F.3d at 1442–45.

The record also suggested that grants of tenure were not always tied only to candidates' qualifications in their fields of specialization. Rather, individual departments, which were often quite small,· had legitimate interests in maintaining a faculty that could cover a broad range of topics. This sometimes necessitated tenuring only periodically, in areas where a particular weakness had developed in the department's tenured faculty. *Fisher* thus involved an adverse employment decision in a context where many qualified candidates could reasonably expect that they would more likely than not be denied tenure at the end of their contracts.

Moreover, the statistics in *Fisher* called the likelihood of discrimination based on sex plus marital status into severe doubt. The record showed, for example, that four of six married women who were in tenure-track positions at the time Fisher was denied tenure—Janet K. Andrews, Debra Meloy Elmegreen, Janet M. Gray and Nancy M. Ide—received tenure in the natural sciences departments. *See id.* at 1445. Two other women—Pinina Norrod and Patricia Johnson—were married when hired or divorced when granted tenure in Vassar's biology department. *See id.* One married woman—Gwen J. Broude—was tenured in the psychology department in 1983, and campus-wide, eighteen of the twenty-three married women considered for tenure between 1972 to 1984 succeeded. *See id.* at 1444, 1445.

Finally, and most importantly, the record suggested a plausible alternative reason, which Vassar may not have wanted to reveal in the litigation, for Vassar's adverse employment decision. In particular, the record showed that Fisher left academia to work in the home for an eight-year period in the middle of her academic career. As the original panel noted, "evidence [in the record] support[ed] an inference that Fisher's eight-year absence from acedemia hurt her chance for tenure" because many members of the tenure committee viewed biology as a rapidly develop-

ing field, which required more consistent devotion to stay abreast of its developments. *See id.* at 1448. Vassar may have been reluctant to proffer this explanation, however, given that Fisher was bringing a claim for age discrimination and that one of her theories of sex discrimination rested on the theory that "this hiatus [was only] a proxy for having children and family." *Id.* at 1448. Proferring such an explanation thus carried the significant risk of exposing Vassar to liability on other grounds,[10] and, in these circumstances, Vassar had highly plausible reasons to lie about its refusal to tenure Fisher. The evidence in support of this explanation was, moreover, sufficiently strong to have compelled the conclusion that this explanation was at least as probable as discrimination.

 *Hollander v. American Cyanamid Co.,* 172 F.3d 192 (2d Cir.1999), decided after the close of briefing in this case, provides another example of how a finding of pretext may not ultimately prove discrimination. In *Hollander,* the Court of Appeals upheld summary judgment against the plaintiff on his age discrimination claim, finding that despite "some doubt" as to the veracity of the defendant's nondiscriminatory justification, the record did not support the conclusion that Hollander was terminated because of his age. *See id.* at 200. The court noted that even if the defendant's explanation was pretextual, it "may have been pretext for various nondiscriminatory reasons," and cited evidence suggesting that friction between the plaintiff and his supervisor was the real motivating factor. *Id.* at 201–02 & n. 5.

*Hollander* thus squarely applies *Fisher*'s rule that a prima facie case plus a finding of pretext will not compel a finding of discrimination in circumstances where the record reveals not only "many possible reasons for the false explanation, stated or unstated," but concrete facts and circumstances that make these alternative explanations plausible enough to compel the conclusion that the "illegal discrimination [was] *no more likely* [the motivating force] than [the alternatives.]" *Fisher II,* 114 F.3d at 1338 (emphasis added).

 In sum, although the in banc panel in *Fisher II* held that review for clear error is generally appropriate when discrimination is inferred from a plaintiff's prima facie case and a finding of pretext, the original panel's reversal rested on extraordinary circumstances, where the record left a "definite" and "firm" conviction that "a mistake ha[d] been committed [in finding Title VII liability]." *Id.* at 1427. Nothing in *Fisher II* suggests that in many, much less most, other contexts, a fact-finder must refrain from inferring discrimination from an employer's inability to explain its actions credibly—especially when the employer is responding to a charge of discrimination.[11] *See, e.g., St. Mary's,* 509 U.S. at 511, 113 S.Ct. 2742 (holding that the "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination"). Indeed, the Supreme Court has stated that

---

**10.** Indeed, the district court itself found reliance on this hiatus and agreed that this reliance was improper. *See Fisher,* 852 F.Supp. at 1225–26. On appeal, the Second Circuit held, however, that "[i]n making tenure decisions, it is perfectly reasonable to consider as a factor the candidate's prolonged absence from academia." *Fisher I,* 70 F.3d at 1448.

**11.** Although the in banc panel did not have to engage in this second stage of the analysis, it did make an analogy suggesting that reversal for clear error may be the exception rather than the norm. In discussing the proper in-

ferences that can be drawn from a defendant's flight from the scene of a crime, a case that the dissent had raised, the court noted that "flight from the scene of a crime ordinarily has evidentiary weight [as an indicator of guilt]." *Fisher II.* 114 F.3d at 1345. The Court then explained how a finding of pretext need not always be probative of discriminatory intent by noting that "flight from a scene of arson shows nothing[, however,] if the defendant fled the scene of a department store inferno during business hours." *Id.* at 1345.

"the [*McDonnell Douglas*] prima facie case raises an inference of discrimination ... because we [ordinarily] presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's*, 509 U.S. at 511, 113 S.Ct. 2742 (holding that in some circumstances, "rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of discrimination, ... and no additional proof of discrimination is required."). Although this presumption, which operates as a matter of law at the first stage of the *McDonnell Douglas* analysis, may not apply in every circumstance at the third stage of the inquiry, it certainly has common sense appeal in the ordinary case. Fact-finders must, moreover, generally rely on common sense propositions like these, gleaned from their everyday experience, to perform their fact-finding functions. *See Fisher II*, 114 F.3d at 1338 ("What is at issue is the drawing of inferences from human behavior.").

The above discussion is limited to the probative value of a finding of pretext in discrimination cases. It bears repeating that either the original evidence in support of a plaintiff's prima facie case or the independent evidence of discrimination can sometimes be strong enough to support a finding of discrimination as well. With these considerations in mind, the Court turns to the evidence in this case.

B. *Failures to Promote*

▇▇▇▇ Given the framework discussed, there is undoubtedly enough evidence in this case for a reasonable juror to have inferred that Greenbaum's gender played a role in SNY's decision not to promote her between 1989 and 1994. First, the plaintiff met all the elements of her prima facie case. As a woman, the plaintiff is a member of a protected class, and a reasonable juror could have concluded that Greenbaum was qualified for a promotion from her supervisor's testimony that she was initially hired for a vice presidential job in terms of responsibilities, from the fact that her responsibilities only grew during most of this period, and from the fact that she often filled in for Amoroso, who was a vice president, when he was away. Greenbaum's qualifications were also supported by the consistently excellent evaluations she received during all but one of the years in question, when she was transferred out of her area of expertise and received an average evaluation from Tunguz—an alleged sexual harasser—in the systems department. SNY concedes the next element of Greenbaum's prima facie case—i.e., that she was consistently denied the title of vice president—but argues that the denials did not occur under circumstances giving rise to an inference of discrimination because no man ever received a promotion instead of her. *See, e.g., Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (noting that it is probative of discrimination when position sought is ultimately granted to person who is not a member of plaintiff's protected class). This last fact does not impair Greenbaum's prima facie case, however, because Greenbaum established that competition for the title of vice president title was not a zero-sum game at SNY: rather than competing for a position that opened only intermittently and could be filled by only one person at a time, she was competing for a title that could be given out at any time and to any number of people. *See, e.g., Tr.* at 498–99. In this factual context, Greenbaum produced evidence suggesting that SNY's failure to promote her occurred under circumstances giving rise to an inference of discrimination by showing that she was consistently recommended and consistently rejected at a firm where men who received this type of support from a supervisor were routinely granted the title. *See Burdine*, 450 U.S. at 254 n. 6, 101 S.Ct. 1089 (noting that the type of proof needed to establish a prima facie case is not inflexible and will depend on the circumstances of the case); *Shumway v. United Parcel*

*Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997) (holding that the "inference of discriminatory element" of a prima facie case "may be proven by showing that a man similarly situated was treated differently").

██ Moreover, although SNY proffered several legitimate non-discriminatory reasons for not promoting Greenbaum during this period, a reasonable jury could have found these reasons pretextual. The explanation Greenbaum received after her annual review, in 1989—that vice presidents could not report to other vice presidents at SNY, and that her direct supervisor, Amoroso, already had this title—was affirmatively called into doubt by evidence of several examples to the contrary and by Amoroso's testimony that the explanation "didn't make sense" in the context of SNY's corporate culture. The explanation Greenbaum received after her next annual review, in 1990—that her "desk wasn't big enough, that [she] didn't have a vice-presidential job"—likewise was contradicted by Amoroso's testimony that she was hired for a vice-presidential job in the first place, that she performed many of Amoroso's duties when he was away, and that her desk was a very profitable part of one of the branch's main profit centers. After her annual reviews in the remaining period from 1991 to 1994, Greenbaum was not given any explanation for the failure to promote her but was told that Ragna, the GM at the time, had essentially vetoed the idea. At trial, Ragna testified that he did not promote Greenbaum between 1991 and 1994 because he never received a recommendation for her promotion from her supervisors. *See* Tr. at 1215, 1217 (testimony of Ragna) (explaining that the organization's way of "dealing with promotions [was] that you have a strong recommendation from a senior person, that person's superior, and I did not have that [for Greenbaum] at that time"); *see also id.* at 1049 (testimony of Zell, GM in 1989) (claiming that Pyron had not recommended Greenbaum for promotion). As noted, however, both Amoroso and Pyron testified that Greenbaum's evaluations and recommendations had been presented to the GM and the GM committee on many occasions, and that they, Amoroso and Pyron, advanced her candidacy consistently and strenuously. *See, e.g.,* Tr. at 97–122, 181–88, 491–98. A reasonable jury could have credited this testimony and found Ragna's explanations (and Zell's) pretextual.

██ Finally, under the specific circumstances of this case, a finding of pretext could have been probative of discriminatory intent. As an initial matter, the decisions not to promote Greenbaum occurred in a corporate setting where there was apparently no limit to the number of vice presidents in the company, where no vacancy was required for a promotion, where traders could be promoted to vice president without any substantial changes in duties or responsibilities that might require additional experience, and where promotion led to no new limitations on SNY's right to terminate the employment. *See, e.g.,* Tr. at 498–99. Thus, at SNY, unlike in the employment context examined in *Fisher,* employees had a reasonable expectation of promotion upon recommendation by their department heads, and qualifications were intimately tied to this recommendation. Many of the considerations that were at play in *Fisher* and that may have contributed to the department's failure to promote the plaintiff in that case, including the scarcity of positions, the need for a different type of non-fungible specialist, and the irreversibility of the decision, are thus absent from this case. More importantly, although in principle, SNY might have acted on all sorts of reasons that it did not reveal in this litigation, the record is devoid of credible evidence that would make any particular explanation as likely as discrimination.

██ There is, moreover, evidence in the record suggesting that SNY was attempting to explain not just an ordinary adverse employment decision but one that deviated significantly from its ordinary

promotional practices. *Cf. Stratton,* 132 F.3d at 879 n. 6 (holding that "[a]ctions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate" and that an employer's decision "'may have been so unusual or idiosyncratic as to shed light upon [its] motivation'" in taking the adverse employment action) (quoting *In re Lewis,* 845 F.2d 624, 633 (6th Cir.1988)). In this case, testimony indicated that the GM committees gave SNY's department heads great deference in terms of their hiring and promotion decisions. *See e.g.,* Tr. at 1044–46, 1123–24, 1217.[12] Although the GM had the final say with regard to these decisions, the recommendations of department heads apparently were routinely rubber-stamped and the GM committee's approval was considered a pro forma step in the promotional process. *See, e.g.,* Tr. at 540. Thus, the evidence that Greenbaum was consistently recommended by her department head but was consistently rejected by the GM and GM committee would, if credited, strongly suggest that SNY departed from its ordinary practices in her particular case. Absent some explanation, this kind of departure strongly supports an ultimate finding of discrimination. *Cf. Stratton,* 132 F.3d at 879 n. 6.

 ■ Greenbaum was also given not one reason but a series of different ones, each of which was found to be pretextual by the jury, and the consistency and repetition of these shifting pretextual explanations lends further credibility to the contention that they served to mask an impermissible consideration. *See EEOC v. Ethan Allen,* 44 F.3d 116, 120 (2d Cir.1994) (noting that shifting explanations can be probative of discrimination); *Schmitz v. St. Regis Pa-*

*per Co.,* 811 F.2d 131, 132 (2d Cir.1987) (finding inconsistencies as evidence undermining credibility of employers's motives). Finally, all of the allegedly illicit actions in this case occurred at a bank where only one member of Greenbaum's protected class, Debra Orlando, had been hired as a vice president in the treasury department in the relevant time period. Orlando was also forced out of her position within a month after Roberts, the deputy GM, described her as "too aggressive." Tr. at 506. She was also the only one in her otherwise all-male group who was not retained at the bank after her group's work was eliminated. *Id.* at 507. Consequently, none of the statistical facts that called a finding of discrimination into doubt in *Fisher* are present in this case. In these circumstances, a finding of pretext presents powerful evidence of discriminatory intent, and a reasonable juror could have found a Title VII violation on the basis of Greenbaum's prima facie case along with a finding of pretext.

 The record also contains, however, ample independent evidence that would support a finding of discrimination. As the Second Circuit has said:

> Evidence of sexual stereotyping may provide proof that an employment decision ... was based on gender. In *Price Waterhouse,* the Supreme Court considered an employer's decision not to promote a female employee in reliance on partners' evaluations that the plaintiff was too "aggressive." The Court upheld the trial court's finding that that characterization "showed sex stereotyping" in operation. It stated that "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman" cannot properly have a

12. SNY makes much of the fact that it filled many of its vice presidential positions through lateral hires. Viewing the record in the light most favorable to Greenbaum, however, as the Court must in this Rule 50(b) motion, the evidence suggesting that department heads were given broad autonomy to manage their departments would make this fact irrelevant.

A corporation that allows department heads a large degree of leeway in managing their departments would be expected to hire laterally in departments with heads that prefer outside expertise but to promote internally in departments, like Greenbaum's, with department heads that prefer a homegrown approach and consistently recommend internal promotions.

certain characteristic "has acted on the basis of gender."

*Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289–90 (2d Cir. 1998) (citations omitted); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for [i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.") (internal quotation marks omitted), *overruled in part on other grounds* by 1991 Civil Rights Act.[13]

In this case, several GMs stated at trial that two of the six principal criteria for promotion to vice president were whether someone could be a proper "role model" for the bank and whether the bank would be "comfortable" with the individual representing the bank. Tr. at 1143, 1131–32. With regard to the criteria that SNY used to identify these appropriate role models and representatives, other evidence suggested that the word "aggressive" was used by SNY officials to describe a form of excellence when describing male traders, *see e.g.* Tr. at 502, but was viewed as a ground for disqualification when considering a woman like Greenbaum, *see, e.g., id.* at 521–22; *see also id.* at 506. Indeed, Pyron testified that members of the GM committee described Greenbaum negatively as an "aggressive woman," *Id.* at 521–23, and this evidence reasonably could suggest that Greenbaum's "aggressiveness" was a reason for SNY's refusal to promote her. This evidence is particularly probative when viewed against Greenbaum's evaluations and performance record, which

indicated that she consistently met each of the other four criteria for vice president (*i.e.*, a strong performance record, a good management record, an important position and dedication to the job). A reasonable juror could have inferred from this evidence that Greenbaum was denied the title of vice president in part because SNY applied standards for promotion that were inappropriately stereotypical and gender-biased. Finally, the record indicates that Roberts, a high level official who was the number-two person at the bank and the only manager who was present during Greenbaum's entire time of employment, stated at one point that he "was against [hiring a particular female candidate for deputy treasurer] on the grounds that he didn't think a woman could control the treasury, the trading people," because the treasury "wouldn't listen to a woman." Tr. at 501–02. Although this sort of comments might suggest that Roberts would have preferred a woman with the aggressive qualities needed to "control the treasury," the opposite inference is more plausible given that Roberts also referred to another women negatively as a "tough broad," and stated publicly that he did not want a "tough broad" working at SNY.[14] *Id.* at 247, 109 S.Ct. 1775. While Roberts did not have the sole authority to decide whether Greenbaum should be promoted, he was a senior member of the committee that had this authority, and was the only person who was a member of this committee for the entire time period in which the jury found sex discrimination. Roberts also shared an office with the GM, who was the most senior member of the committee, and Roberts was often called upon to perform many of the GM's duties. Other courts have held that comments by high-ranking officials such as Roberts (and

---

**13.** The Supreme Court has noted, however, that "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in the particular employment decision." *Price Waterhouse*, 490 U.S. at 251, 109 S.Ct. 1775. "The plaintiff must

[also] show that the employer actually relied on her gender in making its decision." *Id.*

**14.** Roberts was also reported to have said· at one point that a "woman should not be allowed to vote." Tr. at 245.

Carolla as well) are admissible as circumstantial evidence suggesting that there is a particular (discriminatory) corporate atmosphere in which decisions are made. *See Hunt v. Tektronix, Inc.,* 952 F.Supp. 998, 1006 (W.D.N.Y.1997); *see also Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 133 (3d Cir.1997) (comments made by "either the company CEO or by executives with the authority to render personnel decisions" can show a "cumulative managerial attitude"); *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 333 (3d Cir.1995) ("[A] supervisor's statement about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination.")

SNY argues that the mere "absence of objective, expressly-defined promotion standards does not [by itself] establish that [the employer]'s informal system of granting promotions and awards at the managerial level is discriminatory." Def.'s Br. at 56 (quoting *Nicholas v. Nynex, Inc.,* 974 F.Supp. 261, 267 (S.D.N.Y.1997)) (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 990, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). This proposition, while true, is not relevant to the present case. Viewed in a light most favorable to Greenbaum, the record suggests not that SNY lacked objective and expressly defined promotional standards but that it had an objective and consistent policy of promoting employees upon recommendation by their department heads, so long as the employees met certain criteria that were part of the bank's corporate culture. The fact that Greenbaum was consistently recommended for the promotion by her supervisors but consistently rejected by the GM committee when she met so many of

their objective criteria suggests either that SNY was departing from its ordinary practices in her particular case or that the criteria themselves had an inherently discriminatory aspect.[15] For all these reasons, a reasonable jury easily could have concluded that SNY failed to promote Greenbaum from 1989 to 1994 in part because of her sex.

### C. *Failure to Pay Higher Compensation*

SNY argues that even if it failed to promote Greenbaum to vice president in part because of her sex, the jury should not have been permitted to award compensatory damages to her because the evidence can only be read to suggest that she was given the same compensation and benefits as similarly situated men at SNY. *See, e.g., Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1041 (2d Cir.1993) (analyzing evidence in support of Title VII claim for sex discrimination by comparing compensation and benefits obtained by female plaintiff with that of similarly situated males at the defendant corporation). In particular, SNY points to statistical evidence suggesting that Greenbaum was compensated better than some male vice presidents at SNY and to an alleged admission on her part that she was unqualified to perform many of the functions of the male vice presidents who were compensated better.

In *Stratton v. Department for the Aging,* 132 F.3d at 869, the Second Circuit held that in individual disparate treatment cases like the one here, statistical evidence comparing a plaintiff's treatment with that of similarly situated persons who are not members of the plaintiff's protected class can be admitted, without an expert's elaboration, to support an in-

---

**15.** SNY points to Greenbaum's admission on cross examination that no one (male or female) ever received a promotion that Greenbaum thought she deserved. This admission is, however, also not relevant. Greenbaum's testimony was not that she wanted any promotion given to someone else but that she wanted the one *she* deserved. This claim makes sense in the context of an investment bank where there was no limit to the number of vice presidents and no promotion was given at the expense of someone else's.

ference of discrimination so long as the statistics are simple and in no way gerrymandered. *See id.* at 877; *see also Hollander*, 895 F.2d at 84 (approving use of statistics in individual disparate treatment case). Admitting statistical evidence, however, does not require a jury to find that evidence probative. When viewing the statistics, the jury in this case could have deemed the fact that Greenbaum was compensated better than some vice presidents at SNY irrelevant because none of these vice presidents were members of the treasury department, where Greenbaum worked during most of the relevant period. This fact is important because Ragna admitted on cross-examination that employees in "the treasury department in general terms had a higher level of salary and bonuses than many other departments of the bank." Tr. at 1202. Employees in the treasury department were generally compensated better in part because the treasury department made most of the money for the bank, and in part because the "treasury people ha[d] another [employment] market than corporate bankers and . . . accountants" and "if [SNY] want[ed] to compete for [treasury] people, [it] need[ed] to pay the market rates." Tr. at 1202. A reasonable jury could have concluded from this evidence that the relevant comparison group should be limited to male vice presidents in SNY's treasury department, and thus disregarded the evidence relating to vice presidents outside that department.

With the comparison limited to this narrower group, SNY concedes that Greenbaum has produced ample evidence suggesting that she was compensated less than male vice presidents in the treasury department between 1989 and 1994.[16] SNY argues, however, that Greenbaum cannot be properly compared with these traders because she admitted at trial that she was unqualified to perform many of their functions and because most of these traders were lateral hires with outside expertise while she was recommended for promotion from within. SNY mischaracterizes Greenbaum's testimony. Greenbaum's supposed admission was nothing more than a point about the relative specializations and division of labor among SNY's employees. She testified, in full, that just as she was unqualified to perform the work of several other vice presidents who were traders, those vice presidents were unqualified to perform many of the functions that she performed for SNY at substantial profit for the bank. The jury also could have found irrelevant the fact that Greenbaum was not a lateral hire in light of SNY's stated ambition of growing its own leaders, added to the fact that the discrimination found by the jury occurred over a period that was long enough for Greenbaum to have acquired other specializations if SNY had wanted to train her in another area.[17]

Finally, by emphasizing the weight of these comparisons, SNY fails to distin-

16. She showed, for example, that in 1991, she received a bonus that amounted to 3.16% of her previous year's salary. *See* JT 31 at SNY003108. In that same year, male Assistant Vice Presidents apparently received bonuses ranging from 79% to almost 100%. *See id.* In the next year, the only female Vice President, Meg Uyeno, received only a 9.1% bonus. *See id.* at SNY 003110. She also produced ample evidence suggesting that she made less than many of the vice presidents in the treasury. *See generally id.* Viewed in the context of a corporation that the jury found to have been discriminating against women in terms of promotions and other compensation decisions, this evidence could suggest reasonably that Greenbaum's bonuses were artificially lower than they would have been in the 1989–1994 period in part because she is a woman.

17. Although the calculation of lost bonuses plainly required some amount of speculation on the part of the jury, the awards given ranged from only $656 to $2888. Greenbaum's highest bonus was $10,000, in the 1989–1994 period, and the men in her comparison group received bonuses as high as $180,000 (Tunguz), $95,000 (Pak), and $80,-000 (Patronis). *See generally* JT 31. The sums granted by the jury for lost bonuses thus are plainly discounted to cure any undue speculation.

guish between "disparate treatment" and "disparate impact" cases and ignores the primary evidence presented by Greenbaum in this case. In *Cosgrove,* the Second Circuit explained that:

> [u]nder Title VII, discrimination can be demonstrated through evidence of either 'disparate treatment' or 'disparate impact.' To show 'disparate treatment,' the plaintiff is "required to prove that the defendant had a discriminatory intent or motive." 'Disparate impact' is based upon the premise "that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." The evidence in 'disparate impact' cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities."

9 F.3d at 1041 (citations omitted). In the present case, Greenbaum attempted to establish that she was compensated less well because of her sex not only through comparisons with similarly situated males but with more direct proof of disparate treatment, in the form of adverse employment decisions made with discriminatory intent. For example, Greenbaum produced ample evidence suggesting that SNY commonly gave traders a mortgage subsidy benefit, and an unusually high salary increase upon promotion to vice president, *see, e.g.,* PX 116, 128, 133, 146, 151; JT 27a at 12, neither of which she received after her annual reviews. The fact that a reasonable juror could have concluded that SNY failed to promote her in part because of her sex, *see* Part I(a), *supra,* thus implies that it could have found that SNY also failed to increase her salary and benefits in a manner commensurate with this position in part because of her sex. Moreover, many of the GM committee's decisions concerning annual raises and bonuses occurred at precisely the same time as some of their decisions not to promote her. Having found that SNY failed to promote Greenbaum with discriminatory intent, a reasonable jury could also have concluded that those other decisions were tainted with discrimination as well. Greenbaum thus has produced ample evidence in support of her claim for discrimination in compensation and allocation of benefits during the 1989–1994 period.

## II. *Continuing Violation Claims*

SNY argues that even if there is evidence sufficient to support a finding of discrimination in this case, the award should be reduced by $181,303 because all of Greenbaum's claims concerning discriminatory activity that preceded December 1993 are time-barred and she is therefore ineligible to receive back pay for any of those years.

 The time limits for bringing Title VII actions are set forth in section 706, which states that

> [a] charge under this section shall be filed *within one hundred and eighty days* after the alleged unlawful employment practice occurred ... except that in a case [where] an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved *within three hundred days* after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier....

(Emphasis added.) The Supreme Court has read this provision as mandating that a discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before [Title VII] was passed. It may constitute relevant background evidence in a proceeding in which the status

of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no legal consequences.

*United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

 In this case, the 300–day time period is controlling because Greenbaum initially instituted proceedings with the NYSDHR in January 1994, and the NYSDHR is "a State or local agency with authority to grant or seek relief from [a discriminatory] practice or to institute criminal proceedings with respect thereto upon receiving notice thereof," within the meaning of Section 706. *See Humphrey v. Council of Jewish Federations*, 901 F.Supp. 703, 705 (S.D.N.Y.1995). Neither party disputes that the events giving rise to Greenbaum's final claim that SNY failed to promote her in terms of title, salary and benefits ended sometime in December 1993, and neither party disputes that Greenbaum brought an appropriate Title VII charge within 300 days of this activity. SNY relies on Section 706 to argue that Greenbaum's Title VII claims concerning unlawful activity that dated back to 1992 or before are, however, time-barred.

 Greenbaum responds by noting that Section 706's time limits can be tolled if a series of early discriminatory activities are part of a continuing violation that ends some time within the relevant limitations period. The Second Circuit has held that

a plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations. The continuing-violation exception applies where there is evidence of specific discriminatory practices, such as the repeated use of discriminatory seniority lists or employment tests.

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997) (citations omitted). Plaintiffs seeking to establish a continuing violation must meet a threshold requirement of showing that the alleged policy of discrimination not only created a discriminatory effect resulting from past violations, but resulted in an actual Title VII violation within the relevant time period. *See Evans*, 431 U.S. at 557–58, 97 S.Ct. 1885 ("[T]he emphasis should not be placed on mere continuity; the critical question is whether any present violation exists."). Greenbaum meets this threshold requirement because the record contains sufficient evidence to support the jury's finding of discrimination concerning SNY's failure to promote Greenbaum in December 1993. *See* Part I, *supra.*

 Greenbaum also succeeded in her ultimate burden of producing evidence from which the jury could have found that SNY's earlier discriminatory activities were part of a continuing violation ending in December 1993. As discussed earlier, Greenbaum showed that there was a set procedure for promotions to vice presidency at SNY, which consisted of recommendations by supervisor and a final test that derived from the corporate culture of the firm. Greenbaum also produced evidence suggesting that this test included criteria that were inherently discriminatory, and that her inability to obtain the promotion and its accompanying increases in compensation was due in part to the repeated use of this test. From this evidence, the jury could have inferred that Greenbaum was denied the vice presidency because of an ongoing corporate practice that played much the same sort of function as the repeated use of discriminatory seniority lists or employment tests discussed in *Lightfoot. See* 110 F.3d at 907.

 SNY argues that Greenbaum should not be allowed to sweep any of the earlier failures to promote her into the ambit of this action because those inci-

dents were discrete and unrelated employment actions, which were completed with each decision not to promote her. In support of this argument, SNY notes that under the continuing violation doctrine, "[c]ompleted acts such as a termination through discharge or resignation, a job transfer, or discontinuance of a particular job assignment are [generally] not acts of a 'continuing nature.'" *Malarkey v. Texaco, Inc.*, 559 F.Supp. 117, 121 (S.D.N.Y.) (cited with approval in *Lightfoot*, 110 F.3d at 907).

SNY's position has some initial appeal. The Second Circuit has held, for example, that in some circumstances, where vacancies for positions open only intermittently and are sought by more than one person, multiple failures to promote an individual should be deemed "completed acts" once the positions are filled. *See, e.g., Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708 (2d Cir.1996). This proposition is, however, inapposite here. In this case, to reiterate, the record contains ample evidence suggesting that SNY promoted as many vice presidents as it wanted, that the position was continuously available to those who obtained favorable recommendations from their department heads, and that Greenbaum was consistently rejected despite being repeatedly recommended for the position. In these circumstances, there was no time when a one-time position was sought by Greenbaum but was filled by another candidate, such that the adverse employment decision could be deemed "complete." It would therefore be artificial to hold as a matter of law that SNY's actions must have amounted to a series of discrete and unrelated employ-

ment decisions rather than an ongoing, five-year practice of not promoting Greenbaum to the single title of vice president.[18] *Cf. Cajigas v. Banco de Ponce*, 741 F.2d 464, 470 (1st Cir.1984) (noting that the continuing violation theory may be appropriate where promotions take place not to fill a specific vacancy, but rather are "bestowed irregularly from time to time based on meritorious performance and ... after the passage of time it becomes apparent that plaintiff, due to discrimination, is not on the same promotion track as others"); *Coleman v. Clark Oil & Ref. Co.*, 568 F.Supp. 1035, 1040–41 (E.D.Wis.1983) (finding that continuing violation theory applies to "repeated denials of promotion when, despite an employee's expression of continued interest in promotion, the record demonstrates repeated promotion of others in preference to the complainant").

Because the jury could have found a continuing violation under Title VII from 1989 to 1994, and because compensatory damages are awardable under Title VII, the jury had the power in this case to award Greenbaum the challenged $181,303 in back pay under federal law. In light of this holding, the Court need not address the applicable time limits for charges brought under the New York State Human Rights Law or the New York City Civil Rights Law.

### III. *Retaliation Claims*

 SNY next argues that Greenbaum has produced insufficient evidence to support the jury's verdict on her retaliation claim. Title VII of the Civil Rights Act of 1964 prohibits retaliatory actions

---

**18.** SNY claims that by allowing for a finding of continuing violation, the Court will:

foist a Hobson's choice upon all employers [to either face discrimination suits or independently investigate the recommendations of senior managers]. Compliance with such a requirement threatens to stop commerce in its tracks. Non compliance would negate the defense against otherwise time-barred claims. It is difficult to imagine any purpose of the antidiscrimination laws to be

furthered by inflicting either of these draconian penalties on employers.

Def.'s Br. at 55–56. Even assuming *arguendo* that it would stop commerce in its tracks to require employers to evaluate candidates for promotions independently, corporations like SNY that have policies of relying on the department head recommendations could avoid the difficult choice alleged simply by sticking to this policy or departing from it only for sex-neutral reasons.

taken towards employees for opposing allegedly discriminatory practices. Section 704(a) of the statute thus provides that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (1988). The identical behavior is prohibited by the New York State Human Rights Law, see N.Y.Exec. Law § 296, and the New York City Civil Rights Law, N.Y.C.Admin.Code § 8–107(7), and the evidentiary burdens are, once again, identical to those under Title VII, see, e.g., Tomka v. Seiler Corp., 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); Samimy v. Cornell Univ., 961 F.Supp. 489, 494 n. 5 (W.D.N.Y.1997).

▆▆▆ The "ultimate question" in retaliation cases is "whether defendant intentionally discriminated against ... [her] because ... she engaged in a protected activity." Cosgrove, 9 F.3d at 1039 (quoting Burdine, 450 U.S. at 253, 101 S.Ct. 1089.) The Supreme Court has held that the general burden-shifting analysis set forth in McDonnell Douglas in the context of disparate treatment cases applies with equal force to claims for retaliation brought under Title VII. See id. at 1038. To establish a prima facie case of retaliation, a plaintiff must show that

(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based upon her activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.

Id. at 1039. Plaintiffs can establish the fourth element—i.e., the "causal connection"—by showing that "the protected ac-

tivity was followed by discriminatory treatment ... or directly through evidence of retaliatory animus." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir.1990). The rest of the McDonnell Douglas framework, with its emphasis on legitimate non-discriminatory reasons and the importance of a finding of pretext then follow verbatim. See generally Cosgrove, 9 F.3d at 1038–39. When determining the "ultimate question" in retaliation cases, it is important to recognize that "Title VII is violated when an employer is motivated by retaliatory animus, even if objective reasons for the discharge [or other retaliatory action also] exist." Id. at 1039 (citing Sumner, 899 F.2d at 209).

In the present case, neither party disputes that Greenbaum engaged in protected activity when she filed her complaint with the NYSDHR in January 1994 and participated in the subsequent hearing and investigation, which ultimately led to a determination of probable cause against SNY in February 1994. Greenbaum also produced overwhelming evidence suggesting that many of SNY's general managers and other officials knew of her protected activity shortly after this time and before any alleged retaliatory activity. See, e.g., Tr. at 223–32, 1155–57, 1414–15, 1485, 1589–90. Ragna, Roberts and Klosson clearly knew about this activity because they attended the NYSDHR hearing in May 1994. SNY argues that Greenbaum nevertheless failed to meet the remainder of her burden to show retaliation.

▆▆▆ Greenbaum argued that she was the victim of retaliation under two separate theories: first, she argued that SNY refused to promote her to deputy treasurer in May 1994 in part because of her decision to bring her complaint against SNY. Second, she argued that she was placed in the HMX desk in October 1994 and subsequently terminated from working in SNY in part because of her decision to bring her complaint against the bank. When two theories of liability are submit-

ted to a jury, one of which is invalid, and the jury returns a general verdict without specifying the discrete basis for its finding, the jury's entire verdict must be reversed. *See, e.g., United N.Y. and N.J. Sandy Hook Pilot Ass'n v. Halecki,* 358 U.S. 613, 619, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959) (explaining that without this rule, there would be "no way to know that the invalid [theory] was not the sole basis for the verdict"); *Bruneau v. South Kortright Cent. Sch. Dist.,* 163 F.3d 749, 759 (2d Cir.1998) (quoting *Halecki* rule). In the present case, the jury returned a verdict finding retaliation but did not specify which theory, or theories, it credited.[19] The jury's finding of retaliation in this case must therefore be reversed unless there is sufficient evidence to support both of Greenbaum's retaliation theories. *See, e.g., Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987). The Court examines these two theories in turn.

### A. The Denial of Promotion to Deputy Treasurer

█ With regard to Greenbaum's first theory, which concerned SNY's decision not to promote her to deputy treasurer in May 1994, Greenbaum indisputably produced sufficient evidence of retaliation. Amoroso testified, for example, that the position was left open when he was promoted from deputy treasurer to treasurer, and SNY was actively trying to fill it. *See* Tr. at 219–20. He also testified that when he recommended Greenbaum, the idea was immediately shot down by Ragna and Roberts, with Roberts explaining angrily that her candidacy was out of the question because "she had filed something against the

bank" and "took us up to Harlem for [the NYSDHR] meeting and inconvenienced us." *Id.* at 221. This conversation occurred only four months after Greenbaum filed her complaint with the NYDSHR and just after the hearing in which she, Roberts and Ragna were all present. Even if SNY had legitimate business reasons to refuse Greenbaum the deputy treasurer position, this evidence supports a finding that retaliatory animus also played a large role in the decision.[20]

### B. The Final Termination

1. The more difficult question is whether Greenbaum produced sufficient evidence to support her claim that she was terminated from SNY in April 1995 in part because she engaged in a protected activity. There is no doubt that SNY was entitled to terminate Greenbaum for purely business reasons. *See, e.g., Burdine,* 450 U.S. at 259, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The record also contains evidence suggesting that there were three good business reasons to shut down the HMX desk: (1) the swap transactions in which the desk was engaging were subject to double taxation in the U.S. and the U.K.; (2) the overhead needed to run a small HMX desk from New York was prohibitive; and (3) the relevant securities laws essentially prohibited the sale of Nordic bonds in U.S. Markets.

█ Even if these were the true reasons that SNY closed the HMX desk, however, a reasonable jury could have concluded that these problems were predictable before SNY was ever reorganized into an

---

19. The charge to the jury asked only for a general verdict on this issue: "Do you find by a preponderance of the evidence that Defendant retaliated against the plaintiff?"

20. Most of SNY's argument against this theory of retaliation focuses on the claim that Greenbaum only won this verdict because of an improper appeal to the racial bias of the jury. (*See* Def.'s Br. at 86–91.) This argument will be discussed thoroughly in Section

V, *infra,* where the Court addresses SNY's arguments concerning counsel error in general, and whether any such errors warrant a new trial. For now, it is sufficient to note that there is ample evidence in the record to support Greenbaum's first theory of retaliation, and that the jury's verdict need not have been grounded in a racist appeal by Greenbaum.

HMT and HMX division. These reasons do not explain why Greenbaum, in particular, was placed in a position that SNY could have anticipated would be shortly eliminated. In fact, Greenbaum's placement in the HMX desk approximately five months after she attended the NYSDHR's hearing was particularly suspicious in light of other evidence in the record suggesting that Greenbaum had significant experience trading the short-term investments covered by the HMT, that there was a vacancy in the HMT division when it first opened, and that only three people were placed into the HMX division. One of the others placed in the HMX division, Meg Uyeno, was also a woman and had also filed a complaint with NYSDHR, and Uyeno, like Greenbaum, was fired when the desk was eliminated. The third person placed in the division was a male, Russ Pidgeon, who was retained by the bank and given a raise after the HMX desk was eliminated. The decision to place Greenbaum at the HMX desk was also made shortly after the alleged retaliatory failure to promote her to deputy treasurer, and during a period in which Amoroso was warned not to support her candidacy for vice president because such an action "would be looked on very badly by Stockholm" and because "it was unheard of in Sweden" to "file a complaint against your employer." Tr. at 226. Finally, the decision occurred during a period in which Amoroso was consistently being asked to watch over Greenbaum, even though she was making sizeable profits for the bank. From these facts, a reasonable jury could have concluded that SNY intentionally placed Greenbaum at a desk that would be phased out, and placed her there in part because of her protected activities with the NYSDHR.

SNY tries to cast doubt on this conclusion by pointing out that Greenbaum was offered a different job in her termination letter (and in her subsequent meeting with Downes and George). As an initial matter, Greenbaum was told only that she could apply for the job and was never affirmatively offered it. More importantly, Greenbaum was making $107,000 at that time yet was told about a job with a salary range of only $60,000 to $75,000 per year. Greenbaum testified that taking the offer would have been very difficult for her at that time because it was a large step backwards, and because she had already been feeling increasing shame through the years as she saw her peers rise beyond her in the ranks while she remained an assistant vice president. Greenbaum also presented evidence suggesting that SNY officials knew about her increased disappointment. These facts are important in the present factual context because one of SNY's GMs testified that generally speaking, "the 'bank made an effort to reassign individuals whose jobs were eliminated to other positions within the bank' in order to 'minimize any difficulty for the individual,'" and that he did not remember any case in which an individual was asked to take a salary cut upon reassignment. Tr. at 1241–42. Greenbaum thus produced sufficient evidence from which the jury could have found that SNY offered her only a position she would refuse and thus constructively discharged her from her position. Cf. *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360–61 (2d Cir.1993) (holding that showing of constructive discharge is sufficient to show adverse employment action); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983) (holding that plaintiffs may establish a constructive discharge by establishing that her "employer, rather than acting directly, deliberately ma[de her] working conditions so intolerable that [she was] forced into an involuntary resignation," i.e., "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign").

For these reasons, the Court finds that Greenbaum produced sufficient evidence to support her second theory of retaliation as well as her first, and thus denies SNY's motion for judgment as a matter of law reversing the jury's finding of retaliation.

## IV. *Punitive Damages*

SNY argues that even if the verdict in this case stands in its entirety, the award for punitive damages should be vacated because there is insufficient evidence in the record to support this type of award. In the alternative, SNY argues that this award should be reduced substantially because it exceeds the legal limits imposed by relevant federal and state law.

### A. *Evidence Supporting a Punitive Damages Award*

Although punitive damages are not awardable under the New York State Human Rights Law, *see Thoreson v. Penthouse, Int'l, Ltd.*, 80 N.Y.2d 490, 494, 591 N.Y.S.2d 978, 606 N.E.2d 1369 (1992), plaintiffs can recover punitive damages for discriminatory activity both under § 8–502(a) of the New York City Administrative Code and under federal law. In order to award punitive damages under state law in other contexts, a jury must find by a preponderance of the evidence [21] constitutional and common law malice, both of which can be established by showing "willful, wanton, or reckless disregard" for a plaintiff's state-created rights. *See Prozeralik v. Capital Cities Communications, Inc.*, 82 N.Y.2d 466, 479–80, 605 N.Y.S.2d 218, 626 N.E.2d 34 (1993); *see also Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961) (allowing for punitive damages "where the defendant's conduct evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a *criminal indifference to civil obligations*" (emphasis added)). Similarly, in order to award punitive damages on a

Title VII claim, a jury must find by a preponderance of the evidence that a defendant's conduct is not only actionable but exhibits either "malice" or a "reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). These standards are virtually identical: they require, for an award of punitive damages, that a defendant not only intentionally discriminate but do so in the face of a perceived risk that these actions are prohibited by law. In this case, the jury awarded Greenbaum $1.25 million in punitive damages under New York City's Administrative Code, $300,000 of which was awarded independently under § 1981a(b).[22] SNY argues that Greenbaum presented insufficient evidence at trial to establish that her superiors acted with the requisite mental state for an award of punitive damages under either statute. The Court disagrees.

As an initial matter, the jury legitimately found that SNY officials intentionally refused to promote Greenbaum because of her sex on many occasions. *See* Part I, *supra.* Although a higher morally culpable state of mind is generally required for an award of punitive damages under federal and city antidiscrimination law than for a finding of liability, much of the evidence used to support a finding of intent is also probative of reckless disregard of a plaintiff's rights. *See, e.g., Luciano v. Olsten Corp.*, 110 F.3d 210, 221 (2d Cir.1997) (finding malice or reckless indifference on the basis of much of the same evidence used to support underlying liability in a Title VII case). This is especially so where, as here, the illicit activity is an

---

21. Although there was initially some confusion over the standard of proof, the Court has already resolved this issue in favor of a preponderance of the evidence standard. *See Greenbaum*, 979 F.Supp. at 975–83.

22. The parties' briefs exhibit some confusion as to what the dual basis of this award actually means. In *Greenbaum*, 979 F.Supp. at 975–83, the Court held that under the relevant law, the jury's verdict requires that

Greenbaum be awarded the full $1,250,000 punitive damage award under NYC law. The Court went on to hold that punitive damages were independently sustainable under Title VII, up to the relevant amount as set forth in 42 U.S.C. § 1981a, *see Greenbaum*, 979 F.Supp. at 983–85, only to cover the possibility of the punitive damage award under city law being upset either on post-verdict motions or on appeal.

unexceptional and paradigmatic type of discrimination, one that is commonly recognized as prohibited. There is, for example, nothing in the record to suggest that SNY reasonably could have believed its discriminatory actions satisfied a bona fide occupational qualification defense or other statutory exception to liability, *see, e.g.,* 42 U.S.C. § 2000e–2(e) (setting out Title VII defense "where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise"), and indeed, SNY makes no such claim. Nor did Greenbaum's discrimination claims rest on any novelties or ambiguities in the law that might have made it difficult to impute an awareness of the relevant prohibitions to SNY's management. The jury's findings that SNY executives acted with malice or reckless indifference toward Greenbaum's right to be free from sex-based discrimination is supported, finally, by the fact that the discrimination was so egregious and persistent, lasting six years in the face of Greenbaum's repeated efforts to bring her qualifications to the GM committee's attention.

With regard to retaliation, the jury found that SNY's management intentionally refused to promote Greenbaum and then terminated her because she complained of earlier illicit activities. Again, there is nothing unorthodox about the contention that these activities are prohibited by law, and SNY concedes—indeed insists—that it understood that these activities would have been illegal. These facts could suggest to a reasonable jury that when SNY intentionally retaliated against Greenbaum, it did so in reckless disregard of her known civil rights.

 SNY raises only one argument that might throw the legitimacy of this last inference into doubt. SNY points out that it sought legal counsel concerning the NYSDHR proceedings, and argues that this establishes that it was trying in good faith to comply with the law. In support of this contention, SNY cites *Trans World*

*Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), in which the defendant consulted with counsel before modifying a mandatory retirement policy in an attempt to bring it into compliance with new ADEA amendments prohibiting mandatory retirement. The court held that the plan the defendant adopted had a discriminatory effect on one class of employees. The court found, however, that the defendant's actions in consulting with counsel in an effort to create a plan that might balance the competing interests of the parties' labor contract and the ADEA made it unreasonable to conclude that the defendant had acted with any kind of ill will in adopting its new plan. Instead, "[i]t [wa]s reasonable to believe that the parties involved, in focusing on the larger overall problem, simply overlooked the challenged aspect of the new plan." *Id.* at 130, 105 S.Ct. 613. The court concluded that Trans World could not have acted with the willfulness, knowledge, or reckless indifference to plaintiff's federally protected rights that was required for a liquidated damages award under the ADEA.

In this case, however, the fact that SNY consulted with counsel compels no analogous conclusion. SNY is correct that the record contains evidence suggesting that its management and its superiors in Svenska Handelsbanken's International Division were fully aware of the anti-retaliation laws and sought legal counsel to ensure SNY's compliance with its mandates when Greenbaum brought her charges. *See, e.g.,* Tr. at 978–81, 987–89, 1239, 1544, and 1560–62. SNY was also fully aware that Greenbaum had a right to bring these charges without facing retaliation. *Id.* Unlike in *Trans World,* however, this right did not face any competing legal interests that would make it difficult for SNY to conform its actions to the law without the risk of abridging one or another set of rights. The jury's finding that SNY intentionally retaliated against Greenbaum thus suggests that SNY disregarded, rather

than followed, its counsel's advice. Indeed, the record suggests that Roberts and Ragna were outright hostile to the suggestion that Greenbaum be promoted to Deputy Treasurer given that she had filed a complaint with the NYSDHR. In these circumstances, the fact that SNY retained legal counsel does not establish as a matter of law that SNY must have been trying in good faith to refrain from retaliation. *See Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 467 (2d Cir.1989) (holding that jury may infer that actions taken after consultation with counsel are, instead, only "strategic afterthoughts designed to mask discriminatory treatment").[23]

B. *Reduction on Preemption Grounds*

The initial argument that SNY makes for reducing the punitive damages award in this case is that federal law, which allegedly limits punitive damage awards for Title VII violations in circumstances like these to $50,000, preempts any state law purporting to allow for more. (*See* Def's Br. at 93–95).

As an initial matter, SNY misconstrues the applicable limits on punitive damages under Title VII. Section 1981a(b)(3) of 42 U.S.C. limits the combined compensatory and punitive damages awardable in Title VII actions for anything other than "backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964" as follows:

> The sum of the amount of compensatory damages awarded ... for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages ... shall not exceed, for each complaining party—
>
> (A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;
>
> ...
>
> (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

In an Opinion and Order dated September 23, 1997, this Court held that when determining the relevant cap for punitive damages under Title VII, only SNY's domestic employees should be counted rather than all of the worldwide employees of its parent company in Sweden, SHB. *See Greenbaum,* 979 F.Supp. at 983–85. Because SNY employed more than 14 and less than 101 persons, and because the jury awarded compensatory damages only for back pay and refrained from awarding any damages for front pay or pain and suffering, the Court concluded that the maximum punitive damages awardable for the Title VII violations found in this case was $50,000. After inviting a motion for reconsideration in light of the Second Circuit's intervening opinion in *Morelli v. Cedel,* 141 F.3d 39 (2d Cir.1998), however, and after the parties had submitted their briefs in support of the post-trial motions presently under consideration, this Court reversed its earlier decision. *See Greenbaum,* 26 F.Supp.2d 649. The Court held instead that "[under the Second Circuit's ruling in *Morelli,* the

---

**23.** After the jury had been charged and had returned its verdict, and after the parties had submitted all relevant briefing, the Supreme Court decided *Kolstad v. American Dental Association,* —— U.S. ——, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), and clarified the mens rea required for an award of punitive damages under § 1981a. Because of the timing of *Kolstad,* neither party has presented any arguments on its basis. *Kolstad's* general holding—*i.e.,* that punitive damages for Title VII violations require a showing of reckless indifference to a known federally-protected right, and that egregiousness of conduct is probative of this mental state without being a prerequisite to it—, however, is consistent with the analyses in this opinion. The issues in *Kolstad* concerning limitations on an employer's liability for the acts of its management were never raised or briefed by the parties. Nor was the jury charge objected to on any such grounds.

entire worldwide employment of [SHB] is to be counted,]" *id.* at 655, and reasoned that "[b]ecause the parties do not dispute that [SHB] has over 500 employees [worldwide], the proper punitive damages cap under Title VII is $300,000." *Id.* Properly framed, SNY's federal preemption claim thus amounts to an argument that Title VII's $300,000 limitation on punitive damages, which applies to corporations the size of SNY, preempts New York city law, which allows for unlimited punitive damages.

With regard to the merits of SNY's argument, SNY cites only one case for its federal preemption claim, *Chambers v. Capital Cities/ABC,* 851 F.Supp. 543 (S.D.N.Y.1994). In *Chambers,* the court noted that the Age Discrimination in Employment Act ("ADEA") does not allow for punitive damages and held that one of the reasons for this limitation is to encourage informal settlement. *Id.* at 546. The court concluded that allowing damages under state law would undermine this objective and therefore held that the ADEA preempts punitive damages for state law age discrimination claims. *Id.*

■ *Chambers* is, however, inapplicable to Title VII claims. The court's discussion in *Chambers* referenced only the ADEA, and its analysis of this statute was premised on the fact that the ADEA does not allow for punitive damages in any form. *See Commissioner of Internal Revenue v. Schleier,* 515 U.S. 323, 334–35, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995). The Court relied on this premise to justify its conclusion that Congress's purposes in passing the ADEA would be subverted if state law age discrimination claims were to support awards for punitive damages. Title VII, by contrast, not only allows for punitive damage awards, but Congress has explicitly addressed the relation of Title VII to any alternative remedies provided by state or municipal law. Section 708 of the statute, which is entitled "Effect on State laws," provides that:

Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.

42 U.S.C. § 2000e–7. This section makes clear that Congress intended Title VII to add to existing (or future) local remedies for discriminatory employment practices and not to preempt them.

■ SNY also presents a variant of this preemption claim by alleging that New York State law, which has no provision for punitive damages in discrimination claims, preempts New York City law, which purports to allow for uncapped punitive damage awards. The New York Appellate Division has twice rejected this contention, in *Bracker v. Cohen,* 204 A.D.2d 115, 612 N.Y.S.2d 113 (1st Dep't 1994) and *Hirschfeld v. Institutional Investor, Inc.,* 208 A.D.2d 380, 617 N.Y.S.2d 11 (1st Dep't 1994), and no New York state court has accepted it. Although the New York Court of Appeals has not addressed this precise preemption issue itself, the *Bracker* court relied on several Court of Appeals cases in justifying its holding. The court relied, first, on *New York State Club Ass'n v. City of New York,* 69 N.Y.2d 211, 218, 513 N.Y.S.2d 349, 505 N.E.2d 915 (1987), in which the Court of Appeals stated that "the State has not preempted the field of antidiscrimination legislation by enacting the human rights provisions of the Executive Law (§ 290 et seq.)." The *Bracker* court relied, second, on *In re Bri–Mar Corp.,* 74 N.Y.2d 826, 546 N.Y.S.2d 334, 545 N.E.2d 624 (1989), and *People v. Judiz,* 38 N.Y.2d 529, 381 N.Y.S.2d 467, 344 N.E.2d 399 (1976) (per curiam), in which the Court of Appeals held that local laws that only provide additional penalties in the form of punitive damages should not be deemed inconsistent with otherwise

analogous state laws. These Court of Appeals holdings adequately support the *Bracker* decision, and this Court sees no reason to depart from the First Department's conclusion that punitive damage awards under the New York City Administrative Code are consistent with the New York State Executive Law.[24] *See Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (holding that federal courts are bound by the pronouncements of a state's highest court on state law issues, and should give "proper regard" to the decisions of its lower courts).

### C. *Reduction on State Law Grounds*

 SNY argues that even if neither federal nor state law preempts the unlimited punitive damages awardable for discrimination claims under city law, the award in this case should be reduced because it materially deviates from what would be reasonable compensation. New York state law provides that:

> In reviewing a money judgment in an action in which an itemized verdict is required by rule forty-one hundred eleven of this chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

C.P.L.R. § 5501(c). SNY argues that "the size of the jury's .... punitive damages is controlled by the prescriptions of CPLR § 5501(c)," (Def.'s Br. at 102), and Greenbaum tacitly agrees throughout its arguments, (*see, e.g.,* Pl.'s Br. at 64–65). Both parties thus devote a significant amount of time to arguing about how to apply § 5501(c) to the specific facts of this case.

Section 5501(c) does not, however, apply to punitive damage awards under state law.

That § 5501(c) is inapplicable to punitive damage awards derives in part from the nature of the standard set forth in this section. As already noted, this standard allows for remittitur whenever an award "deviates materially from what would be reasonable *compensation.*" (Emphasis added.) Punitive damages are, however, not compensatory in nature and need not in principle bear a rational relationship to reasonable compensation. It would therefore be arbitrary, though not inconceivable, for the legislature to limit punitive damages to an amount that is so closely related to reasonable compensation. More importantly, § 5501(c) by its express terms applies only to itemized verdicts awarded under § 4111. Section 4111, in turn, allows only for compensatory damages. This limitation of § 5501(c) to itemized verdicts under § 4111 provides a second reason for concluding that the standard is inapplicable to punitive damage awards.

Moreover, none of the three cases SNY cites for its contention that § 5501(c) applies to punitive damages supports its proposition. First, in *Byrd v. New York City Transit Auth.,* 172 A.D.2d 579, 568 N.Y.S.2d 628 (2d Dep't 1991), the court remitted an award for both compensatory and punitive damages. As SNY points out, the court explicitly cited § 5501(c) when modifying the compensatory portion of the award. The court altered the punitive portion without ever citing this section, however, doing so instead because the award "deviate[d] materially from what would be reasonable 'considering the purpose to be achieved as well as the mala fides of the defendant[s] in th[at] particular case.'" *Id.* at 581, 568 N.Y.S.2d 628 (quoting *Faulk v. Aware, Inc.,* 19 A.D.2d 464, 472, 244 N.Y.S.2d 259, *aff'd,* 14 N.Y.2d 899, 252 N.Y.S.2d 95, 200 N.E.2d 778 (1964)). It is indisputable that the pur-

---

24. The Court notes, however, that SNY has reserved the right to raise this argument be- fore the appropriate state tribunal.

poses behind punitive and compensatory damages differ under state law, *see Sharapata v. Town of Islip,* 56 N.Y.2d 332, 335, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982), and thus the *Byrd* court's reasoning cannot be construed as an application of § 5501(c) to punitive damages.

Second, although the court in *Laurie Marie M. v. Jeffrey T.M.,* 159 A.D.2d 52, 559 N.Y.S.2d 336 (2d Dep't 1990), stated that "[t]he standard of review of punitive damages is the same as for compensatory damages," it went on to explain that it meant by this statement only that appellate courts have a " 'duty ... to keep a verdict for punitive damages within reasonable bounds considering the purpose to be achieved as well as the mala fides of the defendant in the particular case.' " *Id.* at 60, 559 N.Y.S.2d 336 (quoting *Nellis v. Miller,* 101 A.D.2d 1002, 1003, 477 N.Y.S.2d 72 (4th Dep't 1984)). The court never applied § 5501(c) to punitive damages and in fact went on to state that:

> [i]n determining the amount of punitive damages, the trier of fact can properly consider all circumstances immediately connected with the transaction tending to exhibit or explain the motive of the defendant, the harm done to the plaintiff, the wealth of the defendant, and the degree of deterrence resulting from the award.

*Id.* Importantly, only one of these considerations, the harm done to the plaintiff, bears any relation to compensatory notions.

Finally, in *Parkin v. Cornell University Inc.,* 182 A.D.2d 850, 581 N.Y.S.2d 914 (3d Dep't 1992), the Third Department stated in dicta that "we agree with defendants that the awards of $100,000 in compensatory damages and $100,000 in punitive damages awarded to each plaintiff were so excessive that they 'deviated materially from what would be reasonable compensation.' " *Id.* at 852, 581 N.Y.S.2d 914 (quoting CPLR § 5501(c)). This statement certainly suggests that the court was applying the same standard in examining the compensatory and punitive damage awards in that case. The court, however, remitted the punitive damage award only after finding that it did not "bear a reasonable relationship to defendants' culpability." *Id.* Again, the degree of a defendant's culpability bears no necessary relationship to reasonable compensation. All three of these cases therefore ultimately undermine SNY's contention that § 5501(c) applies to punitive damages.

 The correct state law standard for reviewing punitive damage awards is set forth neither in § 5501(c) nor in the parties' briefs but in the relevant case law. Under New York law, whether to award punitive damages and how much to award are "primarily questions which reside in the sound discretion of the original trier of the facts." *Nardelli v. Stamberg,* 44 N.Y.2d 500, 503, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978). "[T]he amount of exemplary damages awarded by a jury should not be reduced by a court unless it is so grossly excessive 'as to show by its very exorbitancy that it was actuated by passion.' " *Id.* (quoting 1 Clark, New York Law of Damages, § 56, p. 102; *accord* Restatement Torts, Comment d, § 908; 14 N.Y.Jur., Damages § 188); *see also id.* (punitive damage award are "not lightly to be disturbed."). In determining whether an award is grossly excessive in this sense, courts have been instructed to examine whether the punitive damages are "reasonably related to the harm done and the flagrancy of the conduct." *See, e.g., Liberman v. Riverside Memorial Chapel, Inc.,* 225 A.D.2d 283, 292, 650 N.Y.S.2d 194 (1st Dep't 1996); *Suffolk Sports Ctr., Inc., v. Belli Constr. Corp.,* 241 A.D.2d 546, 664 N.Y.S.2d 724 (2d Dep't 1997). Courts have also been instructed to consider the wealth of the defendant, *see McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.,* 256 A.D.2d 269, 682 N.Y.S.2d 167, 170 (1998), because that punitive damages are meant to punish and deter defendants and others from similarly willful or outrageous misconduct, *see Zurich Ins. Co. v. Shear-*

*son Lehman Hutton, Inc.,* 84 N.Y.2d 309, 316, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994); *Biondi v. Beekman Hill House Apartment Corp.,* 257 A.D.2d 76, 692 N.Y.S.2d 304, 308 (1st Dept. 1999). These factors help indicate whether the more fundamental test for remittitur has been met—*i.e.,* whether an award is so grossly excessive as to show by its very exorbitancy that it was motivated by passion.

■ In this case, SNY is a large corporation and it has stipulated that it can pay any punitive damage award granted in this case. This fact casts significant doubt on SNY's contention that the award in this case was so grossly exorbitant that it exceeded the amount needed to serve the legitimate purposes of deterrence. Moreover, as already noted, the jury returned a careful and well-fashioned verdict in this case, in which it found that a punitive damages award was supported by a preponderance of the evidence but not by clear and convincing evidence. This fact undermines the contention that the jury's verdict was motivated by passion. Under these circumstances, the punitive damages awarded in this case is fully consistent with the basic test for the legitimacy of a punitive damage award under state law.

The Second Circuit has stated, moreover, that when "the standard of excessiveness is furnished by state law, the best guide for a federal court, if available, would be decisions of the state's courts in comparable cases indicating at what point awards become excessive." *Consorti v. Armstrong World Indus., Inc.,* 72 F.3d 1003, 1013 (2d Cir.1995), *vacated on other grounds,* 518 U.S. 1031, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996). There are, however, very few cases in which New York state courts have awarded punitive damages in discrimination or retaliation cases outside of the Title VII context, a fact that is probably explained by the fact that New York state law does not allow for punitive damages and only New York City law does.[25] The one case that the parties have pointed out to the Court—*McIntyre,* 256 A.D.2d 269, 682 N.Y.S.2d 167—ultimately supports the propriety of the punitive damage award in this case.

In *McIntyre,* the First Department remitted a punitive damage award from $2.5 million to $1.5 million in a case involving findings of sexual harassment, retaliatory discharge and intentional infliction of emotional distress. The final amount was just over double the amount of compensatory damages awarded. In deciding that $1.5 million was not grossly excessive, the court relied heavily on the fact that "[t]he wealth of a defendant is material to the assessment of punitive damages," *id.* at 170 (citing *Rupert v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904, 905 (4th Dep't 1975)), and on the fact that the jury was instructed to take the size of the parent corporation into consideration in awarding the punitive damages. *Id.* In the present case, as noted, SNY has stipulated that it can pay any punitive damages award, and the jury found a pattern of discriminatory activity followed by two retaliatory attacks, which together were quite egregious. The Court finds no reason based on state law considerations to remit the even smaller punitive damage award of $1.25 million in this

---

25. SNY has stated that:

> In preparing this [Rule 50(b) ] motion, SNY conducted a thorough search for discrimination and retaliation verdicts from the state courts that included punitive damage awards. This investigation included: computerized legal research databases; a commissioned search by new York Jury Verdict Reporter, the leading verdict reporter in new York; inquiry into a study of punitive damages awards in financial injury cases in New York State, released in July of 1997 by the RAND Institute for Civil Justice; and requests for available statistics and supporting materials to the Clerk of the Court for the Southern District of new York and the Staff Counsel for the New York City Commission on Human Rights....

SNY claims that this research produced no state law verdicts awarding punitive damages in retaliation or discrimination cases.

case.[26]

## D. *Reduction on Federal Constitutional Grounds*

SNY's last argument in favor of reducing the award in this case rests on federal constitutional grounds. In *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court held that:

Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose.

*Id.* at 574, 116 S.Ct. 1589. The Court therefore held that overly excessive punitive damage awards can violate a defendant's right to due process. *Id.* at 574–75, 116 S.Ct. 1589. SNY argues that the award in this case should be remitted because it violates the standards set forth in *Gore.*

In reviewing the constitutionality of punitive damage awards under *Gore,* courts must view the evidence in the light most favorable to the nonmoving party and reduce the award only if it "shock[s] the judicial conscience." *See Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 683 (2d Cir.1993). Courts undertaking this review should examine three basic indicia: (1) the degree of reprehensibility of the conduct; (2) the ratio of punitive damages to damages awarded in compensation for any harm suffered; and (3) the disparity between punitive damages awarded and the civil or criminal penalties that could be imposed for comparable conduct. *See Gore,* 517 U.S. at 574–75, 116 S.Ct. 1589.

With regard to the first element—*i.e.,* the degree of reprehensibility of the conduct—the Supreme Court has held that this is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," *see id.* at 575, 116 S.Ct. 1589, in main part because the principle that punishment should fit the crime "is deeply rooted and frequently repeated in common-law jurisprudence." *Solem v. Helm,* 463 U.S. 277, 284, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The *Gore* Court pointed to three considerations for determining the degree of reprehensibility of a given course of action: (1) whether the defendant's conduct was violent or threatened violence; (2) whether a defendant acted with deceit or malice rather than merely negligence; and (3) whether a defendant has repeatedly engaged in the misconduct. *Gore,* 517 U.S. at 575–76, 116 S.Ct. 1589.

In this case, SNY's conduct was never violent, and each instance of discrimination and retaliation found was certainly less reprehensible than the worst imaginable violations, *see, e.g., Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1356 (7th Cir.1995) (reducing punitive damages in recognition that other sex discrimination cases were more egregious). Nevertheless, the jury could have inferred from some of Roberts's comments and other comments made by high-level GMs that SNY was not only negligent regarding Greenbaum's federally protected rights but was acting with malice. Moreover, "repeated misconduct is more reprehensible than an individual instance of malfeasance," *Gore,* 517 U.S. at 577, 116 S.Ct. 1589 (citing *Gryger v. Burke,* 334 U.S. 728, 732, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948)), and the jury found that Greenbaum was subjected to a six-year pattern of discrimi-

---

**26.** Even assuming *arguendo* that SNY could establish that § 5501(c) applies to punitive damage awards, the court reads the cases that SNY cites—*Byrd, Laurie Marie,* and *Parkin* — as suggesting that New York courts interpret this test as checking for material deviation from what would be a reasonable punitive award, given the flagrancy of the conduct, the harm involved, and the wealth of the defendant. For the reasons discussed in the text, the Court therefore concludes that the punitive damages award also meets the test set forth in § 5501(c).

nation, which ended in a retaliatory attack when she finally complained of the misconduct. Other evidence suggests that SNY officials deceitfully hid their adverse actions from Greenbaum over this period, and tried to retaliate against her in a deceitful manner by moving her to a position that would later be phased out for seemingly extrinsic reasons. The record also suggests that this pattern of discrimination may have extended to other female employees or potential employees as well. In these circumstances, an award of $1.25 million is adequately related to the reprehensibility of the conduct at issue.

With regard to the second factor—*i.e.*, the ratio of punitive to compensatory damages—SNY cites an unpublished case from the Southern District of New York, *see Kim v. Dial Service Int'l. Inc.*, No. 96 CIV. 3327(DLC), 1997 WL 458783, at *15 (S.D.N.Y. Aug.11, 1997), for the proposition that "excessiveness is measured by comparing the punitive damage award to the remitted award for pain and suffering." (*See* Def.'s Br. at 114.) SNY reads *Kim* as suggesting that in fact, "[a]wards for back pay do not properly enter into this formulation at all." (*Id.*) Because the jury awarded Greenbaum no compensation at all for pain and suffering, SNY concludes that the proper ratio in this case is $1,250,000 to 0, which is far greater (indeed, infinitely greater) than the 500 to 1 ratio that was held unconstitutional in *Gore. See* 517 U.S. at 583, 116 S.Ct. 1589 ("When the ratio is a breathtaking 500 to 1 ... the award must surely 'raise a suspicious judicial eyebrow.'") (citations omitted).

This argument rests on an overly broad reading of *Kim.* In *Kim,* the court stated that "in this case, it is appropriate to measure the punitive damages against the far smaller figure for compensatory damages" awarded for pain and suffering, because "the award for front pay, and indeed back pay for the period following the plaintiff's termination of employment, must be viewed as largely punitive," *see Kim,* 1997

WL 458783 at *15. This determination about back and front pay was based on the unique circumstances of *Kim,* in which the plaintiff was the only one of many terminated employees to receive a rather large future damages award (*i.e.*, of $65,000 per year for seven years) even though the plaintiff had produced only "scant evidence that he made any effort to mitigate [the] damage [from the loss of employment] or ever intended to work that long." *Id.* The court's decision was thus based on the reasonable assumption that damages already serving primarily punitive purposes should not be compared against the actual punitive damages awarded when calculating the relevant *Gore* ratio. *Kim* does not stand for the proposition, however, that back pay awards always serve punitive purposes.

In the present case, by contrast, the jury refused to award front pay and the Court finds that the back pay award reflected a reasonable calculation of what the plaintiff would have earned had she not faced any sex discrimination, particularly when there was no competent evidence that the plaintiff had failed to mitigate her damages. Courts have held that back pay in discrimination cases can adequately reflect part of the harm suffered by plaintiffs facing employment discrimination, *see, e.g., Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 415 (S.D.N.Y.1996) ("[T]he magnitude of injury to the plaintiff in a Title VII action is not measured solely by the award of compensatory damages; it is also reflected in the size of the back pay award."), and *Gore* instructs courts to look quite simply at the "disparity between the *harm ... suffered ...* and [the] punitive damages award," 517 U.S. at 574–75, 116 S.Ct. 1589 (emphasis added). Because the back pay award in this case—unlike that in *Kim* —cannot be viewed as punitive, the appropriate ratio in this case is $1,250,000 to $320,000 or 3.75 to 1, a figure that is not so different from one that would pass constitutional muster according to *Kim. See* 1997 WL 458783, at *15("The jury's award

of $750,000 in punitive damages does not result in a gross disproportion between the exemplary and the non-exemplary damages [of $520,000]."). Under relevant case law, the ratio of punitive to compensatory damages in this case is not grossly excessive. *See, e.g., Gore,* 517 U.S. at 581, 116 S.Ct. 1589 ("In *Haslip* we concluded that even though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not 'cross the line into the area of constitutional impropriety.'") (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 636–38 (7th Cir.1996)) (upholding a ratio of 6 to 1); *Iannone,* 941 F.Supp. at 415(upholding a ratio of 2 to 1).

Finally, with regard to the third indicium—*i.e.,* the disparity between this award and the civil and criminal penalties awardable for similar forms of misconduct—SNY emphasizes that punitive damages are not awardable at all for violations of New York State's antidiscrimination statutes. *See Thoreson v. Penthouse Int'l, Ltd.,* 80 N.Y.2d 490, 499, 591 N.Y.S.2d 978, 606 N.E.2d 1369 (1992). Nevertheless, as already noted, 42 U.S.C. §. 1981a(b)(3) allows for punitive damages of up to $300,000 in circumstances like the present case where a corporation employs 500 or more persons during the relevant time period and where there are no grounds for any other exemplary damage awards. "The ADEA [also] authorizes, in the case of willful discrimination, an award of liquidated damages equal to an award of compensatory damages." *Paolitto v. John Brown E. & C., Inc.,* 151 F.3d 60, 67 (2d Cir.1998).[27] In the context of housing discrimination, the Federal Fair Housing Act, 42 U.S.C. § 3613(c), places no limits on the amount of punitive damages that are awardable. Finally, as noted earlier, the court in *McIntyre* specifically allowed for a $1.5 million punitive damage award under city law for discriminatory activities that were similar to those found in this case. Defendants of SNY's size who engage in certain willful discriminatory practices thus commonly face the risk of punitive damages equaling $300,000, the amount of awardable non-exemplary damages ($320,-000 in this case), or more than $1 million. Consequently, an award of $1.25 million is comparable to other civil and criminal penalties awarded for similar forms of misconduct, and examination of the three indicia set out in *Gore* suggests that the $1.25 million verdict in this case is not excessive.

In coming to this conclusion, the Court is aware of the recent decision in *Ortiz–Del Valle v. National Basketball Association,* 42 F.Supp.2d 334 (S.D.N.Y.1999), in which the court remitted a $7 million punitive damages award to $250,000. In doing so, the court reviewed an extensive list of federal cases discussing punitive damages in discrimination and retaliation cases, and observed that "[t]he only case cited by plaintiff in which a punitive damage award even approaches the award here is *Greenbaum v. Svenska Handelsbanken . . . .* " *Id.* at 346. The court expressed some doubt about the validity of the verdict in this case and suggested that "[t]he Court [had not yet] examine[d] the verdict for excessiveness pursuant to *Gore* and *Lee.*" *Id.* at 346–47.

The verdict in this case cannot, however, be compared to the ones in these cases in absolute terms but must be compared by reference to the *Gore* factors. Of the relevant verdicts cited in *Ortiz–Del Valle* and by SNY,[28] for example, most were remit-

---

**27.** Although ADEA awards are technically for liquidated rather than punitive damages, they are predicated on a showing of willfulness that is analogous to the mental state required for punitive damage awards in discrimination and retaliation cases under federal and city law.

**28.** The following cases, cited either in *Ortiz–Del Valle* or by SNY, suggest that $1.25 million is extraordinarily high under *Gore,* are inapplicable on technical grounds: *Annis v. County of Westchester,* 136 F.3d 239 (2d Cir. 1998) (vacating judgment for new trial on compensatory and punitive damages for evi-

ted under circumstances in which the original ratio of punitive to compensatory and back pay awards was far larger than those here. *See, e.g., Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir.1996) (remitting award from $200,000 to $75,000, when only $1 in nominal damages was awarded for the underlying claim of malicious prosecution); *Rivera v. Baccarat*, 10 F.Supp.2d 318, 333 (S.D.N.Y.1998) (remitting award to $40,000 when the original ratio was approximately 18:1); *Mahoney v. Canada Dry Bottling, Co.*, No. 94–CV–2924 (FB), 1998 WL 231082, * 8–9 (E.D.N.Y. May 7, 1998) (remitting award to $100,000 when the original ratio was approximately 19:1); *Iannone v. Frederic R. Harris*, 941 F.Supp. 403 (S.D.N.Y.1996) (remitting to $50,000, when the original ratio was approximately 10:1). In *Ettinger v. State University*, No. 95 Civ. 9893(RWS), 1998 WL 91089 (S.D.N.Y. Mar.2, 1998), the court remitted separate awards of $50,000 against three defendants to $2,000 per defendant, even though the original ratio was nowhere near as high as these other cases. *See id.* at *13. The court made this decision, however, because the defendants were individuals rather than corporations, and because it found that $2,000 would serve the purposes of deterrence in these circumstances. *See id.* Finally, in *Broome v. Biondi*, 17 F.Supp.2d 211 (S.D.N.Y.1997), the court upheld a punitive damage award of $410,000, with a ratio of approximately two to one, against five members of a cooperative board and a corporation for their discriminatory refusal to sublease a cooperative apartment to the plaintiffs. This number is not so distant from $1.25 million, and no other cases have been brought to this Court's attention. *Id.* at 229.

■ Although all of the awards in these cases were less than $1.25 million, none of the cases involved defendants who explicitly stipulated to their ability to pay any punitive damages award. This stipulation qualifies SNY for the very highest punitive damages awardable for conduct of its flagrancy. The Second Circuit has, moreover, held that in assessing the three elements of *Gore*'s shock-the-conscience test, courts must:

> keep in mind the purpose of punitive damages: [which is] to punish the defendant and to deter him and others from similar conduct in the future. Thus, [the] task is to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.

*Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir.1996) (internal quotations and citations omitted). The Court has grave doubts as to whether the purposes of deterrence would be served adequately by an award that is much smaller than $1.25 million in the present circumstances. Given the purposes underlying punitive damages, SNY's stipulated wealth, and the above examination of *Gore*'s three primary indicia of excessiveness, nothing in the present jury award, or in its relation the award for compensatory damages and back pay, shocks the judicial conscience. *See Pac. Mut. Life*, 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (holding that a punitive damage award of "more than 4 times the amount of compensatory damages . . . does not cross the line into the area of constitutional impropriety").

## V. Claims Concerning Counsel Error

SNY finally argues that the entire verdict in this case should be vacated because

dentiary reasons); *Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir.1997) (remitting Title VII award to $300,000, but under the statutory caps set forth in Title VII rather than under *Gore*); *Kim*, 1997 WL 458783, at *1 (remitting because substantial portion of compensatory damages was actually imposed for punitive reasons, thus making their comparison

improper); *Anderson v. YARP Restaurant, Inc.*, No. 94 Civ. 7543(CSH)(RLE), 1997 WL 27043 (S.D.N.Y. Jan. 23, 1997) (not remitting verdict, and thus saying nothing about the maximum amount awardable); *O'Quinn v. New York University Medical Ctr.*, 933 F.Supp. 341 (S.D.N.Y.1996) (not remitting verdict).

of numerous errors that allegedly were committed by Greenbaum's counsel during the trial. In particular, SNY claims that Greenbaum's attorneys (1) discussed and mischaracterized certain propositions of law in its opening statements, (2) consistently stated improper opinions and cited improper statistical evidence during summation, (3) illicitly appealed to the passions of the jury and (4) engaged in childish gesturing and whispering during summation. This last ground can be disposed of readily because the Court did not witness any "childish gesticulations" or "whispering" that would rise to the level of counsel error.

■■■■■ The first and second grounds for SNY's argument are also unavailing. Although the Court agrees that Greenbaum's counsel behaved in a manner that was far less than professional on many occasions during the trial, and although the Court agrees that many errors were committed, these errors do not warrant a new trial in this case. Curative instructions are ordinarily sufficient to render counsel errors harmless. *See United States v. Perry*, 643 F.2d 38, 51 (2d Cir. 1981), and the Court gave numerous such instructions after Greenbaum's counsel discussed propositions of law during opening and closing arguments and used speculation and inadmissible statistical evidence during summation. *See, e.g.*, Tr. at at 45–46, 59–60, 1916–21, 1925, 1932–33, 1950–51, 1065–66, and 1971–75.

That these curative instructions served their proper function is, moreover, apparent from the jury's precise and well-crafted verdict. If left uncured, the above errors might have easily supported a verdict in favor of Greenbaum on many more of her claims. After four days of deliberation and several requests for clarification on the instructions, however, the jury returned a verdict that found for Greenbaum on her sex-based discrimination claims but found for her in only six out of the seven years alleged; granted her an award for substantially less back pay than she had asked for; refused her any front pay or compensation for pain and suffering; rejected her claim for age discrimination outright; and returned a verdict stating that her case in favor of punitive damages was supported by a preponderance of the evidence but not by clear and convincing evidence. This last finding created a question of law as to whether Greenbaum would be awarded punitive damages above the relevant Title VII cap, and thus, in an important sense, took the question out of the jury's hands. The jury's conduct was so well-tempered and thought out that it prompted this Court to remark:

> I have sat on many trials. In very, very few have I had as attentive a jury and as responsible a jury as you. It has been my sheer pleasure to have you as jurors.
>
> I see from your verdict as well that you parsed out the evidence as well as I would have done.

Tr. at 2086. The Court cannot conclude under these circumstances that the jury ignored this Court's many curative instructions in these circumstances.

■■■■ With regard to its final claim concerning an improper appeal to jury bias, SNY points to one case in support of its argument for a new trial. In *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534 (2d Cir.1992), the Second Circuit held that "[n]o verdict may stand when it is found in any degree to have been reached as a result of appeals to regional bias or other prejudice," *id.* at 541. SNY argues that the verdict in this case should be vacated because, during closing argument, Greenbaum's counsel pointed out that while deriding Greenbaum for filing charges with the NYSDHR, Roberts referred to the proceedings as occurring in "Harlem" rather than on "125th Street in Manhattan," thus possibly suggesting that his discomfort with the proceedings was based in part on their location in a predominantly African–American neighborhood.

**274**

As an initial matter, it is highly speculative to suggest that an attorney can appeal to a jury's racial passion merely by pointing out that a member of SNY referenced a location as in "Harlem" rather than at "125th Street in Manhattan." [29] It is, moreover, hard to see why the comment in question would constitute an appeal to the racial passion of "the jury" when the jury had only four African–American members and a majority of the members were non–African–American. Finally, in *Pappas*, the court explicitly acknowledged that jury verdicts are normally sustained even after attorneys have made more regionally or racially based comments than were found in that case. The court justified its decision to depart from this general trend by saying:

> Although in many cases where no new trial was ordered the frequency of ... regional based comments exceeded those made in this case, the present case is distinct because the defense offered no proof, presented no witnesses and contented itself with a very brief summation that covered only a little over five pages of the transcript.

*Id.* at 540. The distinguishing features of *Pappas* are notably absent in the present case. SNY has adduced only one potentially race-based remark in the context of an eleven-day trial, which contained extensive witness testimony and opening and summation remarks and ended with a jury verdict that displayed a level of thoroughness that belies any suggestion of passion-based judgment. Even assuming *arguendo* that the comment here improperly appealed to the bias of the jury, the comment was therefore not prejudicial in the context of this trial. *Cf. Smith v. National R.R. Passenger Corp.*, 856 F.2d 467, 472 (2d Cir.1988) (holding that two paragraphs of improper argument in a 55–page summation were not so prejudicial that reversal was required). For the foregoing reasons,

SNY has failed to adduce counsel errors that were prejudicial enough to warrant a new trial in this case.

## CONCLUSION

For the reasons discussed, the Court denies SNY's Rule 50(b) motion requesting a judgment as a matter of law vacating the charges of discrimination and retaliation in this case. The Court also denies SNY's motion to reduce the compensatory damages awarded in this case because the evidence adequately supports a finding of a continuing violation. The Court further denies SNY's motion to vacate or reduce the punitive damages awarded in this case because there was adequate evidence to support a punitive damages award and the award was not excessive. Finally, the Court denies SNY's motion for a new trial on the basis of counsel error.

**SO ORDERED**

---

**29.** This is especially true when Roberts was most likely uncomfortable with the proceedings because they might expose SNY to liability, and when "Harlem" might have been the easiest way to identify the location of the proceedings if he did not know the exact address.